UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PEARSON EDUCATION, INC., et al.

Plaintiffs,

-against-

THE TEXTBOOK GUY LLC, et al.

Defendants.

07 Civ. 7890 (PKC)

DECLARATION OF CHRIST GAETANOS IN OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE THE FINAL JUDGMENT AND PERMANENT INJUNCTION ENTERED MARCH 5, 2008 AND ADJUDGE DEFENDANT THE TEXTBOOK GUY, LLC IN CONTEMPT

CHRIST GAETANOS hereby declares pursuant to 28 U.S.C. 1746 that the following is true and correct, except when otherwise indicated:

1. I am a member of the Bar of the State of New York and have been admitted to practice in the Bar of this court *pro hac vice*.

2. I make this Declaration in opposition to Plaintiff's motion to enforce the Final Judgment and Permanent Injunction entered March 5, 2008 and adjudge Defendant The Textbook Guy, LLC ("TBG") in contempt, and further compelling TBG to pay to Plaintiffs forthwith all amounts due under the Final Judgment, together with interest and attorneys' fees. A copy of the Final Judgment sans the 40+ pages of Exhibits is attached as Exhibit 1.

3. While the Plaintiffs papers concerning its motion for contempt are not specific in the matter, we presume from reading of them, and in particular from the citations to authority in

Plaintiffs' Memorandum of Law and Supplemental Memorandum of Law, and from the overall circumstances of the litigation, that we are concerned here only with a motion for civil contempt.

4. For the sake of simplicity, I will follow the order of declarations and statements set forth in the Dunnegan Declaration dated June 4, 2008, correcting, supplementing and amplifying where necessary or desirable.

5. In paragraphs 2 – 8 of the Dunnegan Declaration, he describes certain events concerning "The First Contempt Motion." The relevance of this "First Motion" and the allegations in these paragraphs to the instant contempt motion against TBG is unclear.

6. The Complaint and the subsequent Amended Complaint was styled "Pearson Education, Inc. [et al.] v. Matthew Stirling d/b/a thetextbookguy.com, [et al]." TBG was not a named party, nor was it separately served. As counsel both to Mr. Stirling and to TBG, I prepared and signed the Answers to both Complaints but never on behalf of TBG since I never thought that TBG was a party to the action.

7. Upon information and belief, Mr. Dunnegan knew that there was such an entity as TBG because he included its name in each of the ten or so third-party subpoenas that he sent to me (and, I presume, issued) during the pendency of the litigation, in par. 10 or 11 of the schedule attached to each such subpoena.

8. Although I do not believe Mr. Dunnegan or I ever discussed the matter very much until just before the March 5, 2005 Permanent Injunction and Final Judgment ("Final Judgment"), I never concealed the existence of the LLC from Mr. Dunnegan. Indeed, Mr. Stirling federal tax returns for 2004, 2005 and 2006, which I sent to Mr. Dunnegan on October 31, 2007 (even before the November 16, 2007 Rule 26 conference), clearly reference TBG on

Schedule C thereof for each year, as does the 2007 Stirling federal tax return (albeit misspelled). Copies of IRS forms 1040 and Schedule C for each of these four years is attached as Exhibit 2.

9. In addition, and also on October 31, 2007, I supplied Mr. Dunnegan with a balance sheet through October 30, 2008 is titled "The Textbook Guy Balance Sheet." A copy of that balance sheet, and copies of the balance sheets dated March 1, 2008, April 1, 2008 and June 12, 2008, are attached as Exhibit 3.[1] I also supplied Mr. Dunnegan with The Textbook Guy Profit and Loss" statement on October 31, 2007, which I have not attached because it does not appear to be terribly significant to much of anything concerning Plaintiffs' motion for contempt.

10. TBG became a party to the litigation as of March 5, 2008, the date the Court signed the Final Judgment, at my request, which I made in connection with my work and the work of TBG's insurance coverage counsel, Richard A. Galbo, Esq. ("Mr. Galbo") to persuade TBG's insurer, The Hartford ("Hartford"), to reverse its decision to deny coverage for the claims made in the Plaintiffs' Complaints, work that proved successful. Mr. Dunnegan agreed to this request. A copy of the six declaration pages of and the four pages of Arizona changes to TBG's policy is attached as Exhibit 4.

11. Upon information and belief, none of the various discovery notices and requests or replies thereto referenced TBG.

---

[1] **The assets figures for the October 30, 2007 and March 1, 2008 balance sheet also includes book inventory, and a large share of that inventory consisted of books that TBG returned to Plaintiffs later in March, without compensation, as part of the settlement and in compliance with the Final Judgment. None of these balance sheets, or the balance sheets dated as of April 1, 2008 or June 12, 2008, reflect the Plaintiffs' liability, as expressed in the Final Judgment, $38,000 insurance indemnity settlement (against which Mr. Galbo claims what appears to be a retaining lien of $5,000 as a result of his contingent fee) or my fees (which, too, were contingent).**

12. The Final Judgment itself, which was the first document in this case to bear a caption identifying TBG as a party, is signed by Mr. Stirling alone and by Mr. Stirling on behalf of TBG, a strong indication that all concerned treated them as two different parties.

13. It appears that no one considered TBG to be party to the litigation that resulted in the Final Judgment, at least not until I raised the matter with Mr. Dunnegan shortly before the Final Judgment was signed. When the Court signed the Final Judgment, TBG became a party, not before.

14. While this is a technical point, to be sure, it is significant nonetheless, as several of the following statements should make clear, especially with respect to the default letter Mr. Dunnegan apparently sent on April 2, 2008 and the acceleration notice letter that Mr. Dunnegan apparently sent on April 16, 2008. A copy of each letter is attached at Exhibit 5.

15. In par. 2 of the Dunnegan Declaration, he states that "Defendants" made the first payment of $25,000. . . ." This is not quite accurate.

The payment, which was sent on February 29, 2008 to Mr. Dunnegan to hold in escrow, was made by TBG only. My cover letter makes clear that TBG is the remitter. Thus, only the Defendant TBG made the first payment. True enough that TBG made the payment on a joint and several obligation, but only TBG made the payment. Copies of my February 29, 2008 letter (along with a copy of the $25,000 check and mailing receipts) are attached as Exhibit 6.

16. The acceleration letter (Mr. Dunnegan's April 16, 2008 letter) is addressed to Mr. Stirling and TBG. So was his April 2, 2008 letter, the one that declares a default with respect to the April 1, 2008 ($15,000) payment. However, the reference on each letter is "Pearson v. Stirling," even though TBG became the first named party as of March 5, 2008. The salutations on both letters is "Dear Mr. Stirling." Nothing in the letter indicates whether either letter was

sent to Mr. Stirling individually or in some representative capacity for TBG, and nothing in either letter refers to whether the acceleration or default (as the case may be) applies just to Mr. Stirling or to both Mr. Stirling and TBG. Since a lot turns on this distinction, it bears examination.

17. When Plaintiffs filed the "First Contempt Motion," they used the old caption, the one that did not include TBG in the case's title.

18. The Order to Show cause concerning the "First Contempt Motion" deals only with Mr. Stirling. It is addressed to him, and requests relief against him, and him alone. TBG is not mentioned.

19. Given the above, it is fair to conclude, as I did at the time of the "First Contempt Motion" that Mr. Dunnegan gave notice of acceleration only to Mr. Stirling. Of course, the terms of the "First Contempt Motion" clearly apply only to Mr. Stirling.

20. Upon information and belief, no Defendant or any of their respective representatives impeded Plaintiffs from filing a contempt motion, no matter how unfounded it might have been, against both TBG and Mr. Stirling. Since they filed only against Mr. Stirling, they are bound by that filing, and as noted above, since the "First Contempt Motion" targeted only Mr. Stirling, there is ample associated factual and logical basis for asserting that Mr. Dunnegan only gave notice to Mr. Stirling.

21. Candidly, TBG regards the filing of the instant contempt motion as a form of harassment, a seriatim filing prompted either by design or outright sloppiness but nonetheless an unnecessary burden, especially when viewed in the light of TBG's attempts to resolve the matter in light of its influx of insurance proceeds and Plaintiffs' outright refusal to negotiate except on

onerous and indefensible terms. (Please see footnote 6 of my accompanying Memorandum of Law, which describes this in terms that are more empirical.)

22. If my key assertion above – that TBG never received either a default letter or an acceleration notice - then there was possibly no default by TBG and certainly no acceleration of the payments due. Accordingly, Plaintiffs' current demand for the full $38,000 indemnity settlement from Hartford is highly excessive, nearly 244% of the amount actually due (including the May and June $300 per month monthly payments).

23. In par. 3 of the Dunnegan Declaration, he asserts that he contacted me by phone on April 2, 2008, and that I responded to his call the same day via e-mail. Is this the sort of disrespect for court orders and egregious delay that supports a motion for contempt?

He also asserts that my e-mail stated that Mr. Stirling was "quite sick." I believed then, and have no reason today to believe otherwise, that this was true, but is this relevant to a contempt motion?

24. In par. 4 of the Dunnegan Declaration, he asserts that he contacted me by phone on April 14, 2008, and that I responded to his call the next day via e-mail. I have found no authority for the conclusion that this is the sort of disrespect for court orders and egregious delay that supports a motion for contempt.

25. He also asserts that my e-mail stated that Mr. Stirling was having trouble with funds." I believed then, and have no reason to believe otherwise, that this was true, but in this case, this is relevant to a contempt motion because inability to perform is a defense to civil contempt.

26. Upon information and belief, Plaintiffs knew well before the Final Judgment was entered that TBG and Mr. Stirling were both insolvent.

27. Upon information and belief, Plaintiffs knew well before they filed the two contempt motions that both TBG and Mr. Stirling were.

28. Given the way in which things began – the October 30, 2008 TBG balance sheet shows a small company with a seriously negative net worth – and the way things have unfolded – Mr. Stirling has filed for bankruptcy and TBG's financial condition has gone from pretty bad to much worse – apparently, I told Mr. Dunnegan the truth. I have found no authority for the conclusion that telling the truth is a ground for a contempt finding.

29. Add to this the Plaintiffs ridiculous demands that my firm pay for Mr. Galbo's fees – addressed in more detail below and in my Memorandum of Law – and one gets the sense either that Plaintiffs are truly covetous, or simply too arrogant to pay attention to the facts. Either way, their analysis and their behavior are hurtful, to the system, to my clients and to me.

30. In paragraphs 4 and 6 of the Dunnegan Declaration, he refers to his April 2, 2008 and April 16, 2008 letters. My thoughts on these are expressed above.

31. In paragraph 9 of the Dunnegan Declaration, Mr. Dunnegan indicates that Mr. Stirling filed bankruptcy once this Court issued its Order to Show Cause. As far as I know, Mr. Stirling had every right to file bankruptcy, so is the point of this paragraph anyone who files bankruptcy, thus frustrating Mr. Dunnegan's clients, subject to a contempt sanction for having the audacity to exercise his/her legal rights?

32. In paragraphs 9 – 14 of the Dunnegan Declaration, he describes and misdescribes certain events concerning TBG's successful pursuit of insurance coverage, initially denied, over a period of 5 ½ months. Copies of Hartford's denial letter dated December 12, 2007, Mr. Galbo's initial written response to the denial dated February 7, 2008 and his subsequent written response dated April 18, 2008 are attached as Exhibit 7. As well, I have enclosed an Affidavit

from Mr. Galbo that more fully describes his role in this litigation and the work he did to obtain coverage.

33. While these do not bear directly on the merits of the litigation or this contempt motion, they do afford the reader a good sense of how complicated the insurance coverage matter was. This, in turn, makes Plaintiffs' demand that my firm pay Mr. Galbo's fee for obtaining the fund from which only Plaintiffs will benefit all the more absurd.

34. In par. 9 of the Dunnegan Declaration, he fails to mention that he had a copy of the policy in mid-December 2007, plenty of time for him to review it and contemplate its role in this litigation.

35. As noted, Mr. Galbo (largely) and I (to a much lesser but nonetheless significant extent) spent a lot of time fashioning the responses (especially the April 18, 2008 response) to Hartford. Because we both concluded that we had a good chance of recovering a significant amount, each of us (separately) agreed with TBG to accept our fees going forward from the date of tender (early December 2007, December 6, I believe) on a contingency basis. That is, if our judgment about coverage had been wrong, neither of us would have gotten paid for any services rendered after the date of tender.

36. Mr. Dunnegan and I conversed several times about possible coverage under the policy, to the degree that we spoke about the possibility of further amending the Complaint. Mr. Dunnegan ultimately told me that he felt that there was no coverage under the policy, and this in turn prompted me to turn my attention to the then proposed Final Judgment to see what we might do in that connection to shore up what both Mr. Galbo and I believed to be a meritorious challenge to Hartford's initial denial of coverage. I suggested several changes, and Mr.

Dunnegan accepted all of them. Apparently, they helped, despite Mr. Dunnegan's firm skepticism about the likelihood of coverage.

37. In addition, and somewhat as an aside, during December 2007, January 2008 and February 2008, Mr. Dunnegan and I conversed and exchanged e-mails on the subject of a possible bankruptcy and Mr. Stirling's and TBG's wobbly financial conditions. On January 30, 2008, I sent Mr. Dunnegan several cases concerning the impact of a possible bankruptcy by Mr. Stirling or TBG or both on the continuing enforceability of the then proposed Final Judgment. In mid-December 2008, roughly three months before the Court signed the Final Order, Mr. Dunnegan, Mr. Stirling's first bankruptcy counsel (David Hindman) and I conversed by phone about the implications to Plaintiffs of possible bankruptcy filings.

38. Mr. Dunnegan and I often discussed TBG's and Mr. Stirling's respective insolvencies. At one point, Mr. Dunnegan suggested that "he" should borrow the money that Plaintiffs were then demanding, a suggestion that I flatly rejected. As a consequence of all of this and more, the parties agreed to at least two material changes to the then proposed Final Judgment: (a) elimination of any reference to the willfulness of any infringing behavior (which the Court itself objected to) and a lessening of the total amount owed. Both of these eventually were memorialized in the Final Judgment that the Court signed on March 5, 2008.

39. In paragraph 10 of the Dunnegan Declaration, Mr. Dunnegan refers to my e-mail of May 6, 2008 about a possible "settlement" (his quotes) of the insurance claim. If Mr. Dunnegan is trying to make a point about this settlement – that is what these things are usually called - then he should make it clearly, backed up with facts or at least a passable legal point or two. I did e-mail Mr. Dunnegan twice about this offer, a circumstance that he seems to find offensive, or perhaps just as a convenient whipping post. Since the defendant in a contempt

proceeding has to exercise some degree of diligence to attempt to comply with what was ordered, I am genuinely puzzled as to what I was supposed to do with the circumstances I had to deal with except inform Mr. Dunnegan and see if I could work anything out.

40. The premise behind my contacts with Mr. Dunnegan – on May 6, 2008 and may 23, 2008, via e-mail, and on June 3, 2006, via telephone did not change from the one discussed often and many times in the months leading up to the Final Judgment: the Defendants did not have money and they wished to put the matter behind them sooner rather than later. I am unable to find any authority that this behavior is contemptuous, of anyone, and Mr. Dunnegan has cited none.

41. I have mentioned a present value analysis. The present value of the payment schedule in the Final Schedule as of March 1, 2008 was $60,102.21 (based on an assumption that the present value of the two lump sum payments was equal to their combined future value and a discount rate of 6%). Since May 6, 2008, the date I first presented this information to Mr. Dunnegan, William Dunnegan, Plaintiffs have never challenged either the assumption or the discount rate. The discount rate – while arbitrarily selected – is the approximate interest rate that lenders charge residential creditors with good credit for primary residential financing and a primary home to offer as security for such financing. Neither TBG nor Mr. Stirling fits these criteria. Indeed, neither comes close to satisfying these criteria. (By comparison, the present value of this payment schedule at 7% would be $58,300.57, and the present value at 8% is $56,674.97.)

42. Once TBG was certain that it had reached a settlement with Hartford, TBG (through me) offered Plaintiffs a total of $58,000, $25,000 paid in March 2008 and the balance ($33,000, which is the indemnity payment that TBG's insurer agreed to pay after a lengthy and

difficult negotiation less the cost of getting it), payable immediately upon acceptance of the reasonable offer described above. *This is 96.5% of the 6% present value, 99.5% of the 7% present value and 102% of the 8% present value.* From insolvent debtors. With no further risk. Plaintiffs rejected this offer, and countered with offers that were considerably higher but that had little, if any, basis in law or logic.

43. When I spoke with Mr. Dunnegan on June 3, he was angry at the prospect of even discussing a resolution. Angry or not, Plaintiffs do not have the privilege to reject nearly total payment and then blame TBG. Mr Dunnegan insisted that the Plaintiffs have a "rock-solid" claim of nondischargeability against Mr. Stirling in his bankruptcy, and therefore they had no reason to negotiate. This aggressive use of the bankruptcy laws is, apparently, quite acceptable, but my reminder that, in a bankruptcy, the March 1 payment was subject to a preference recaptures ostensibly constitutes a "threat." To TBG, it sounds like a double standard, more of what amounts to a sort of junk law that characterizes Plaintiffs' prosecution of this case.

44. On May 23, 2008, Mr. Dunnegan responded to me by inquiring whether I "was interested in compensating Mr. Galbo from the portion of fees that you have already received." A copy of a succession of e-mails on the subject are attached as Exhibit 8.

45. This concept presents ethical issues, but even if there were none, it is irrational. The defense and indemnity obligations of an insurer are separate obligations. "The duty to defend . . . is not the same as the duty to indemnify. The duty to defend arises at the earliest stages of litigation and generally exists regardless of whether the insured is ultimately found liable." *INA Ins. Co. of N. Am. v. Valley Forge Ins. Co.*, 150 Ariz. 248 (App.1986).[2] And as

---

[2] **I cite only to Arizona law because TBG operated only in Arizona, the state in which the policy was issued and delivered.**

Hartford's May 30, 2008 letter indicates, the insurance award was made on these two different bases: defense and indemnity.

46. Mr. Dunnegan also asked whether "[i]f [I] collected 99% of [his] claim, is it fair to pay plaintiffs 50 percent." This, of course, is inaccurate; Plaintiffs are being offered 96.5% percent, but this is less troublesome than the underlying premise, which is fundamentally and obviously stupid, or worse. That it was stated at all, especially in the context of the underlying law concerning the difference between defense and indemnity duties and given Hartford's May 30, 2008 letter in which Hartford itself separated the two awards, betrays the Plaintiffs' outright greed and mean-spiritedness. Plainly, any reference to what's "fair" is just posturing on the part of the Plaintiffs.

47. In the course of preparing this Declaration, I examined generally any ethical duties that might arise even if I was to agree to the sort of fee-splitting that Mr. Dunnegan seemed to be insisting upon. One source for my investigation was the Grievance Comminttees for the 11th Judicial District. The attorney there acknowledged that there were issues, arising mostly from DR 2-107(A)(1) & (2), DR 5-103(B) and DR-5-107 (A) and (B).

48. He described the entire attempt to negotiate a resolution to the problem – TBG's lack of funds, Plaintiffs' lack of payment, and TBG's and Mr. Stirling's general desire to get this case behind him on fair terms to all - as a "fraud." He criticized me for calling in the first place, as if an attempt even to try to work things out without court involvement was itself contemptuous. He first insisted on payment in full of the accelerated $51,000, which was accelerated (of course) because neither Defendant had the funds or the assets to pay it initially. Then he demanded all $38,000 of Hartford's indemnity award, plus another "12 over time," which I took to mean another $12,000 dollars, for a total of $50,000, an odd request coming from

parties whose first "over time" arrangement with the same debtor has turned out to be somewhat unsuccessful. He made these demands of Defendants who, by all measures, appear to have few resources.

49. Mr. Dunnegan did not tell Mr. Galbo or me that he had written directly to or otherwise contacted Hartford. It is just startling to have to contemplate this overreaching on the part of Plaintiffs – companies with billions of dollars in assets, revenues and profits - to acquire more than what they need or deserve . . . or bargained for or (depending on present value assumptions) what was ordered.

50. According to my recollection of a conversation he had with Mr. Galbo on June 3, 2008, Mr. Dunnegan made a demand of Mr. Galbo for the entire $38,000.[3]

51. But under either demand, the most stupefying things about them are these: Plaintiffs are demanding complete payment from a fund – the insurance proceeds – that they not only did nothing to create but that was ultimately created from a source he once expressly rejected as worthy of his further effort; they want one lawyer to split his fee with another, when in fact neither engaged the other (TBG engaged both, separately) and both worked and billed separately for separate work performed; they want one lawyer to become responsible for the financial obligations of his client; and they want all things, purely by coincidence of course, when they realized fairly late in the game that In short, they want something for not causing

---

[3] **Given the present value analyses referenced above, a payment to Plaintiffs of the full $38,000 indemnity award means that they will have been paid $63,000 (the original $25,000 plus the $38,000). This is nearly $3,000 more (about 105%) than the amount due under the 6% present value, about $4,700 (about 108%) more than the 7% present value; and about $7,300 more (about 111%) than the amount due under the 8% present value.**

**This is just one of the reasons that I made the assertion that the Plaintiffs are being avaricious in the matter.**

trouble they have no right to cause. This negotiating posture, and this motion, represent a backhanded shakedown, nothing more.

52. Or in other words, TBG – by pursuing its insurance claim (for months, at its expense and effort) when it had no duty to do so, when it could have resolved things promptly and decisively (and to the Plaintiffs' serious detriment) by filing bankruptcy at any time from the commencement of the action until even now, and by offering the net proceeds of the indemnity portion of that recovery (which is the only part of it that Plaintiffs have any claim – such as it might be - at all to) after deduction for the legal fees that it took to get it, and by offering immediate payment of 96.5% of the present value of the settlement amount (instead of payment over ten years) has "been reasonably diligent and energetic in attempting to accomplish what was ordered." *Powell v. Ward*, 643 F.2d 924, 932 (2nd Cir. 1981) (internal citation and quotes omitted), *cert. denied* 454 U.S. 832 (1981). TBG did all of these things, and more, with the active assistance of counsel: Messrs. Galbo and Gaetanos, who were working for TBG on a contingency basis, and Mr. Stirling's present bankruptcy counsel; it's not as though either of the Defendants was blithely ignoring either the Court or the Plaintiffs.

53. It was my intent to resolve what I knew to be a problem via negotiation. If Mr. Dunnegan finds anything offensive in this approach, or in the notion that it is fair to pay for what you get (which is what I proposed by stating that the net insurance settlement should be the gross indemnity amount less Mr. Galbo's fee for getting it . . . ultimately for the Plaintiffs).

54. Plaintiffs knew of Mr. Stirling's financial condition at the time Plaintiff and Mr. Stirling negotiated and then signed the Final Judgment (consenting thereto).

55. In par. 11 of the Dunnegan Declaration, Mr. Dunnegan states that he contacted Hartford directly to assert a N.Y. Ins. Law 3420(a) claim. This section of the Insurance Law

allows certain creditors to make claims against a judgment creditor's or insolvent's insurer, under certain conditions.

56. Upon information and belief, section 3420 applies almost all the time to negligence claims, although the issue has not been settled. But in any event, it applies by its plain terms only to a policy issued and delivered in New York State.

57. The Second Circuit, in *Marino v. New York Telephone Company*, 944 F.2d 109 (2nd Cir. 1991), the court construed identical language in N.Y. Insurance Law 3420(d), and concluded without hesitation that the language meant exactly what it said: in order for the rule to apply, the policy had to have been both issued and delivered in New York State. Since TBG's policy was purchased, issued and delivered in Arizona, then I conclude that section 3420 does not apply. Please refer to the policy declaration pages and the "Arizona Changes" pages for further support for this proposition. A copy of Marino is attached as Exhibit 9.

58. As Mr. Dunnegan noted, Hartford denied his claim, for other reasons as stated in its May 30, 2008 letter to him, which he attached to his Declaration. It is noteworthy that even Hartford made no reference to the defense costs as having any bearing on the indemnity obligation.

59. Yet the incident itself is yet another scattershot, poorly reasoned thought attempt to gather some leverage to . . .well, to get another 3.5% (or slightly more than $2,000 worth of value. And it is yet another sign that the Plaintiffs are less interested in the "fairness" they claim to want. They are more interested smashing bankrupt and insolvent persons.

60. In par. 12 of the Dunnegan Declaration, Mr. Dunnegan asserts that he "told [me] that plaintiffs had chosen to assert a claim directly against Hartford." I do not recall this remark, but my recollection is not strong enough to deny that he made it. I do know that when both Mr.

Galbo and I learned of this later that day (Mr. Galbo learned from Hartford; I learned from him). both of us were shocked and mad, particularly at the slipshod and backhanded manner in which the issue was handled.

61. In par. 14 of the Dunnegan Declaration, Mr. Dunnegan relates what he learned about Hartford's payment of our fees to "defend" (his quotes). If Mr. Dunnegan has a point to make about our services, he should make it, with backup and a degree of logic as well. Anything else is merely unprofessional. (As an aside, and even though this is boastful to a degree, the bulk of my own judgments in this case, even as to areas of law outside my normal scope of practice, have been pretty solid. I have made my mistakes in this case, but I have not sought to hold others accountable for them.)[4]

62. In par. 15 and 16 of the Dunnegan Declaration, Mr. Dunnegan complains in a way that suggests his clients and he are being treated unfairly. I do not believe that is unfair to position my insolvent clients to a point where they are free to offer 96.5% of an amount due, nor do I believe it is unfair to have the beneficiary of that offer to pay for obtaining it. I do believe that it is unfair for someone else to take the burden or obtaining it, and I believe this contempt motion is utterly unfounded under Supreme Court and Second Circuit authority.

63. A copy of Mr. Stirling's Bankruptcy Petition and Schedules is attached as Exhibit 10

64. Accordingly, and on Mr. Stirling's behalf, I respectfully request that this Court take no further action with respect to the motion, including and especially the portion of it that

---

[4] **I should point out that Mr. Dunnegan has estimated that his own fees in this matter would exceed $10,000. For what? Slipshod, imprecise work, some of which was merely copied from the attempt to hold Mr. Stirling in contempt six weeks ago, and the rest of which essentially has no apparent foundation in law or fact? On behalf of TBG, we insist that Mr. Dunnegan defend his fee, in detail.**

requests an order adjudging Mr. Stirling in contempt of the Court and an award of attorneys' fees and costs in connection with the motion.

65. In the event that the Court is unwilling to accept my Declaration as adequate support for TBG's position that it should not be held in contempt or held liable for Plaintiffs' attorneys' fees, then we respectfully request that Mr. Stirling and others be given an opportunity to testify in person as to his current financial condition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

Executed on June 13, 2008

s/Christ Gaetanos

Christ Gaetanos