# Christ Gaetanos

| | |
|---|---|
| From: | Christ Gaetanos [cgaetanos@att.net] |
| Sent: | Sunday, May 25, 2008 2:59 PM |
| To: | Christ Gaetanos |
| Subject: | FW: Stirling |
| Attachments: | DiFranco 04-18-08.signed.abridged.ltr.pdf.pdf |

**From:** Christ Gaetanos [mailto:cgaetanos@att.net]
**Sent:** Sunday, May 25, 2008 2:58 PM
**To:** 'William Dunnegan'
**Subject:** Stirling

Bill:

*Your premises and your facts are wrong.*

As for splitting payments with Mr. Galbo, why? An insurance policy does not cover the insured's costs in securing coverage once a claim has been made, whether via negotiation or otherwise. Also, the law is very clear that an insurer's indemnity and defense obligations are separate and separately evaluated, neither depending on the other. Mr. Galbo negotiated them this way; so did the insurer. Moreover, there are at least two ethical questions here, and we have no intention of crossing that line.

The PV analysis is sound, except to the extent that it should be weighted less in your clients' favor. Keeping this in mind, the insurer agreed to pay about 63% of the agreed damages, not 50% (and the insured already paid virtually all the rest, so . . . what is your clients' point about 50% v. 99%?). The only apt comparison is between 96.5% (the proposed payment) and 99% (your idea about how much of our bill was paid).

This settlement is awfully good, considering that the insurer: (a) started, and stayed quite adamantly for a long while, at zero and (b) took months to agree to settle the claim. You are welcome to speak w/Mr. Galbo directly if you want details about the insurance merits and the negotiations.

(N.B.: Since the publishers would benefit directly from the defendants' lawyers' efforts, maybe we should consider your point about fee-sharing in a different context. The insurance settlement was our doing, not your clients', and because of our efforts, the publishers stand to get a lot more than they would have w/out that effort. But, they do have to "stand," so to speak, to get it, and the time for doing so has just about run out. I don't make this point out of insolence or as sarcasm; there is a factual basis for it. If the publishers reject the offer, effectively they will indeed share the damage settlement amount . . . because the trustee is going to charge that amount for services/costs concerning 3/1 payment and any further publisher claims, as a priority administrative claim.)

Fairness? There is no legal or rational correlation between the percentage of defense costs paid and the percentage of indemnity paid.

Continuing, the publishers have aggregate earnings in the range of $3B, on revenues 3-4 times that amt., from assets still much greater than that. As far as I can tell, each of the publishers is doing just fine (Pearson Education: 2007 sales up 6%, profits up 9%; Wiley: 2007 sales up about 20%, operating income up about 4%; TMC: 2007 sales up 8.3%, operating income up 14.9%; etc. ). I see/hear that the educational publishing market has good prospects for the future, and Pearson itself is outperforming the industry. Mr. Stirling/TBG, on the other hand, whose assets, revenues and profits are considerably less, they are broke/bankrupt, etc., and Matt in particular gets to rebuild his life. This is so to a material degree because of obligations arising from the publisher's lawsuit.

The publishers' theory of these cases and their strategy/tactics remind me of a neatly configured floral arrangement, prepossessing at first . . . but after exposure to room temperature, reduced merely to naked plant stems. As it is, the publishers' overall effort suggests a abuse/misuse of IP rights in order to restrain competition. *See Morton Salt, Loews, Aiken,*

1

*SONY* & *Fogerty*, all S. Ct. cases, *Lasercomb* (4th Cir.) and *Practice Management* (9th Cir.). *Napster* allowed the defendants to engage in substantial discovery about the record companies' business practices because there was evidence that the plaintiffs "had engaged in 'anti-competitive behaviors' and 'price fixing'." Do the publishers really want to head down this path, among others, in this case? I could go on, but under the circumstances, talk about fairness seems beside the point.

Mr. Galbo has advised that all negotiations were conducted by telephone. The only letter or e-mail from/to the insurer that addressed amounts demanded was the one he sent to the carrier on April 18, 2008. I have attached a scanned copy to this letter, w/one deletion: since the amt. of the fee request he made on our behalf is irrelevant to the offer or to the amt. due to your clients, I redacted it.

The publishers are owed what they are owed (in this case, what they agreed to accept), and the (generously computed) offer is 96.5% of that amt.

C.


From: William Dunnegan [mailto:wd@Dunnegan.com]
Sent: Friday, May 23, 2008 1:43 PM
To: Christ Gaetanos
Subject: RE: Stirling

I take it that you are not interested in compensating Mr. Galbo from the portion of the fees that you have already received?

If you collected 99 percent of your firm's claim, is it fair to pay plaintiffs 50 percent?

What about sending the documents concerning the negotiation?


From: Christ Gaetanos [mailto:cgaetanos@att.net]
Sent: Friday, May 23, 2008 12:57 PM
To: William Dunnegan
Cc: Laura Scileppi
Subject: RE: Stirling


I am trying to get instructions from my client, but this much I can tell you: the offer to Pearson is $33K more, plus amts. previously paid; the $5K for Mr. Galbo would come from the $38K damage award.

What is the relevance of question 2, in light of the offer?

C.

From: William Dunnegan [mailto:wd@Dunnegan.com]
Sent: Friday, May 23, 2008 11:40 AM
To: Christ Gaetanos
Cc: Laura Scileppi
Subject: RE: Stirling

A couple quick questions.

1.      In your e-mail of 5/6, you said that the insurance company would pay $33K. Below you said $38K. Did it increase its offer or are you proposing to deduct the $5K legal fee from the plaintiffs' share.

2.          What percentage of your firm's requested fee did the insurance company pay, and what was the dollar amount of the payment?

3.          Would you be willing to .pdf to us the written correspondence back and forth with the insurance company that shows that it agreed to pay half of the claim?

---

From: Christ Gaetanos [mailto:cgaetanos@att.net]
Sent: Friday, May 23, 2008 10:13 AM
To: William Dunnegan
Subject: Stirling
Importance: High

Bill:

As previously noted, the insurer has agreed to pay half of the damages plus defense costs. The damages were $76K (future value); therefore, the insurer agreed to pay $38K. Coverage counsel is Richard Galbo. He charged $5,000 to contest the original denial of coverage, contingent on recovery. Some time ago, we (my firm) agreed to accept the overwhelming portion of our fee -- the part we submitted to the insurer, outside of the small retainer we took early in the case - on the same basis. The insurer paid most of our requested fee, but not all of it.

The insurer initially denied coverage on two bases: (a) late notice; and (b) the activities giving rise to liability were not contemplated by the policy. Both had merit, especially the latter. You and I discussed coverage several times before our respective clients reached agreement on a settlement, and at least one time afterwards. The insurer raised, among many other things, the fact the complaint does not allege advertising as either a direct infringement or a cause of such infringement. The matter was complicated still further because there was no such insurance for previous periods, the insurance in question was canceled shortly after Pearson sued, the insurer had highly relevant concerns about the time of the allegedly infringing sales and the manner in which they were made, etc. Mr. Galbo told me that his discussions w/the insurer bordered on the acrimonious. Under all the circumstances, both Mr. Galbo and I recommended the insurer's offer to our mutual client. The client accepted the offer, and instructed us accordingly.

I am reluctant in general to set deadlines, but given the bankruptcy issues, we are hemmed in on time. If your client does not accept the offer, I expect the trustee to reclaim the $25K paid in March as a preference item. Under the circumstances, if we have not reached some understanding by 5:00 p.m. on 5/27, I will assume that the offer is rejected. In any case, if your clients do not accept by that date/time, this offer will be deemed w/drawn, w/out need for further notification.

I expect to be working most of this weekend and Monday, so feel free to call.

C.


*********

Christ Gaetanos

Amigone, Sanchez, Mattrey & Marshall, LLP
1300 Main Place Tower
Buffalo, New York 14202
716-852-1300 (O)
         1344 (F)
    870-1366 (C)


CIRCULAR 230 NOTICE: Any tax advice contained herein (including in any attachments) is not intended to be used, and

cannot be used, to (i) avoid penalties that may be imposed on a taxpayer or (ii) to promote, market or recommend any tax-related matter.

**CONFIDENTIALITY NOTICE:** This electronic mail transmission may contain confidential information, which belongs to the sender and which may be protected by the attorney-client or other legal privilege or right. If you are not an intended recipient, you are hereby notified that any copying, disclosure, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please notify me immediately at cgaetanos@att.net or cgaetanos@amigonesanchez.com and delete the original message. Thank you.