UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

PEARSON EDUCATION, INC., et al.          :
                                         :
                    Plaintiffs,          :
                                         :
        -against-                        :          07 Civ. 7890 (PKC)
                                         :
THE TEXTBOOK GUY LLC, et al.             :
                                         :
                                         :
                    Defendants.          :
_____  :

MEMORANDUM OF LAW OF DEFENDANT THE TEXTBOOK GUY, LLC IN
OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE THE FINAL JUDGMENT AND
PERMANENT INJUNCTION ENTERED MARCH 5, 2008 AND ADJUDGE DEFENDANT
THE TEXTBOOK GUY, LLC IN CONTEMPT.

Defendant The Textbook Guy, LLC ("TBG")[1] respectfully submits this Memorandum of

Law in opposition to Plaintiffs' motion to (a) enforce the Permanent Injunction and Final

Judgment of this Court entered March 5, 2008 ("Final Judgment"); and (b) adjudge TBG in

contempt for failing to make the $15,000 payment due on April 1, 2008.

## SUMMARY STATEMENT OF THE CASE

The case has been stated in greater detail in the Declaration of Christ Gaetanos, Esq.,

counsel to TBG, and in the Affidavit of Richard A. Galbo, Esq., special counsel to TBG for

insurance matters.  In essence, TBG and its sole member and manager, Matthew Stirling ("Mr.

Stirling"), in return for the termination with prejudice of the instant litigation, agreed to (a)

_____

[1]      **Plaintiffs, in their papers, refer to The Textbook Guy, LLC as "TTG."  No one else does.**

certain restrictions on their future conduct concerning the sale of certain editions of works published by any of the Plaintiffs, and (b) to pay to Plaintiffs $76,000 (as follows: $25,000 payable on March 1, 2008; $15,000 payable on April 1, 2008; and $300 per month for 120 months beginning May 1, 2008). Only the financial obligations are in issue in this proceeding; the restrictions on future conduct are not in issue in this proceeding (nor has either TBG or Stirling suggested or behaved at any time in any manner for any reason to indicate that they should be in issue). Collectively, TBG and Mr. Stirling are referred to herein as "Defendants."

Neither Defendant has admitted or was required to admit any liability with respect to the allegations in the Complaint or the subsequent Amended Complaint. The Final Judgment contained a clause allocating all amounts payable to "statutory damages pursuant to 17 U.S.C. § 504(c)(1) for Plaintiffs' respective works first sold by defendant in August, September and October 2007." In other words, the parties agreed to (and the court approved) an allocation of damages to basic statutory damages under the U.S. Copyright Law, not increased statutory damages that may apply to infringement[s] committed . . . "willfully. . . ." 17 U.S.C. § 504(c)(2).

The range for basic statutory damages under 17 U.S.C. § 504(c)(1) is $750 per work to $30,000 per work. Based on the works listed in Exhibits A – D of the Final Judgment, the per work damage award was less than $250 (closer to $225), which is less than one-third of the minimum statutory damages specified in 17 U.S.C. 504(c)(1), and quite close to the $200 per work absolute minimum mandated under 17 U.S.C. 504(c)(2) (second sentence) for infringers

who were "not aware and had no reason to believe that his or her acts constituted an infringement of copyright. . . ."

Thus, initially we have at least two indications of the seriousness (or, more accurately, the lack of seriousness) of the alleged offenses, and by extension, the "character and magnitude of the harm threatened by the continued contumacy"[2] [*New York State National Organization For Women v. Terry*, 886 F.2d 1339, 1353 (2nd Cir 1989, *cert. denied* 495 U.S. 947 (1990) ("*Terry*")]: (a) no admission, or finding, of underling liability; and (b) an agreed damage award computed with reference to the very lowest end of the scale.  While it is not our intent to suggest that a court order – any court order – is not a document to be taken seriously, this Final Judgment should be considered in its context, one parameter of which is that both TBG and Stirling have complied with all of its terms except the one they cannot comply with, and as to that, they made an energetic effort to get close (and have indeed gotten close).

The present value of the payment schedule in the Final Judgment as of March 1, 2008 was $60,102.21 (based on an assumption that the present value of the two lump sum payments was equal to their combined future value and a discount rate of 6%).  Since May 6, 2008, the date Mr. Gaetanos first presented this information to William Dunnegan, Plaintiffs' counsel, Plaintiffs have never challenged either the assumption or the discount rate.  The discount rate – while arbitrarily selected – is the approximate interest rate that lenders charge residential creditors with good credit for primary residential financing and a primary home to offer as security for such financing.  Neither TBG nor Mr. Stirling fits these criteria – indeed, neither

---

[2] **By this quote, we do not admit any contumacy.**

3

comes close - so they are likely to attract a higher discount rate. Of course, the higher the rate, the lower the present value. (By comparison, the present value of this payment schedule at 7% would be $58,300.57, and the present value at 8% is $56,674.97.)

TBG (not Stirling) made the first payment ($25,000) to Mr. Dunnegan on time in escrow on February 29, 2008, via Federal Express, which Plaintiffs' counsel received on March 3, 2008, to be disbursed only upon the Court's execution of the Final Judgment. The Court signed the Final Judgment on March 5, 2008. Neither TBG nor Stirling has made any further payments, because – at least until June 2, 2008, when the insurance proceed arrived – they could not afford to. Stirling declared bankruptcy on or about April 25, 2008, so even if he wanted to pay, he has limited control over his own assets. TBG has not had business operations for several months before that, and plans not to have any more, ever.

Mr. Stirling's bankruptcy Petition shows assets of $268,863.19 and liabilities of $652,562.96. Of his assets, $250,000 is the asserted value of his former home. Of his liabilities, $284,222.95 represents the secured claims of the mortgagees for that home. If these deducted from the total asset/liability figures, Mr. Stirling's net worth changes to negative $349,476.85. Of Mr. Stirling's liabilities, the one arising from the Final Judgment is not even the largest.

Mr. Stirling's tax returns show the following adjusted gross incomes:

| | |
|------|----------|
| 2004 | $ 8,234 |
| 2005 | $ 2,627 |

| | |
|---|---|
| 2006 | -$25,081 |
| 2007 | -$67,902 |

TBG did not file separate returns; its income and expenses were reported on Mr. Stirling's returns.

TBG, according to its balance sheet dated October 30, 2007, shows assets of $111,994.70 (about half of that was book inventory, and a large share of that half consisted of books that TBG returned to Plaintiffs as part of the settlement and in compliance with the Final Judgment) and liabilities of $231,574.47, or a negative net worth of $119,579.77. According to its balance sheets dated March 1, 2008, April 1, 2008 and June 12, 2008, the figures are:

| | Assets | Liabilities | Net Worth |
|---|---|---|---|
| Oct. 30, 2007 (shown for comparison) | $111,994.70 | $231,574.47 | ($119,579.77) |
| March 1, 2008 | $ 51,235.66 | $235,727.68 | ($184,492.02) |
| April 1, 2008 | $ 434.60 | $238,658.76 | ($238,224.16) |
| June 12, 2008 | $ 1,146.75 | $240,284.63 | ($239,137.88) |

The assets figures for the March 1, 2008 balance sheet also includes book inventory, and a large share of that inventory consisted of books that TBG returned to Plaintiffs later in March 2008, without compensation, as part of the settlement and in compliance with the Final Judgment. None of these balance sheets, or the balance sheets dated as of April 1, 2008 or June 12, 2008, reflect TBG's liability arising out of the Final Judgment, or the $38,000 insurance

indemnity settlement (against which Mr. Galbo claims what appears to be a retaining lien of $5,000 as a result of his contingent fee), or Mr. Gaetanos's fees (which, too, were contingent and have now been paid).

From almost the beginning of this litigation, Defendants maintained that they were insolvent and incapable of paying any large judgment or settlement amount. They supplied to Plaintiffs ample data concerning their financial circumstances, their inventory, their suppliers and their sales of the allegedly infringing works (balance sheet, tax returns, etc.), much of this even before the Rule 26 conference (initial disclosure took place on October 31, 2007; the Rule 26 conference took place on November 16, 2007). Thereafter, Defendants continued to supply information and documents periodically as Plaintiffs requested. It does not appear that Plaintiffs ever objected in this regard, so presumably they were satisfied with their content. Plaintiffs, however, never honored a single one of the Defendants' several discovery requests.

On January 30, 2008, Mr. Gaetanos sent Mr. Dunnegan several cases concerning a possible bankruptcy by Mr. Stirling on the continuing enforceability of the then proposed Final Judgment. In December 2007, roughly three months before the Court signed the Final Order, Mr. Dunnegan, Mr. Stirling's first bankruptcy counsel (David Hindman) and Mr. Gaetanos conversed by phone about the implications to Plaintiffs of possible bankruptcy filings. During December 2007, January 2008 and February 2008, Mr. Dunnegan and Mr. Gaetanos continued to converse and exchange e-mails on the subject of a possible bankruptcy.

From time to time, Mr. Gaetanos and Mr. Dunnegan discussed, albeit casually, TBG's and Mr. Stirling's respective insolvencies. At one point, Mr. Dunnegan brazenly suggested that Mr. Stirling should borrow the money that Plaintiffs were then demanding, a suggestion that Mr Gaetanos rejected out of hand. As a consequence of all of this and more, the parties agreed to at least two material changes to the then proposed Final Judgment: (a) elimination of any reference to the willfulness of any allegedly infringing behavior (which the Court itself objected to) and a lessening of the total amount owed. Both of these, among other changes, eventually were memorialized in the Final Judgment that the Court signed on March 5, 2008. The upshot: neither Mr. Stirling's bankruptcy filing nor TBG's and his serious insolvencies should have come as any surprise to Plaintiffs or their counsel.

During the same period – December 2007 through February 2008 – Messrs. Dunnegan and Gaetanos conferred with one another regarding TBG's insurance claim. Mr. Dunnegan was advised that TBG's insurer, The Hartford ("Hartford"), had denied coverage on December 12, 2007 and that Defendants had retained Mr. Galbo. In that context, we discussed the possibility that Plaintiffs' might again amend their Complaint to allege behavior that would bring the claim clearly within the ambit of TBG's insurance policy, since the nature of the Defendants' business required them to engage in extensive "advertising" as that term is used in an insurance context. Ultimately, Mr. Dunnegan declined to do so – a circumstance that probably complicated TBG's insurance claim – because (as he put it to Mr. Gaetanos) he felt that TBG was not likely to obtain insurance coverage given the language of the policy and the circumstances of the case. However, at my request, ultimately Mr. Dunnegan did agree to the allocation to 17 U.S.C. § 504(c)(1) and to an allocation for sales made during the policy period.

TBG retained Mr. Galbo to review the policy and opine as to possible coverage in the face of Hartford's December 12, 2007 denial of coverage. When Mr. Galbo opined that he though he could obtain coverage, TBG and Mr. Galbo agreed that Mr. Galbo's fee for obtaining coverage would be contingent of his success in obtaining that coverage.

Shortly afterwards, Mr. Gaetanos and TBG agreed as well that payment of Mr. Gaetanos's legal fees and disbursements incurred subsequent to the date the claim was tendered to Hartford would be contingent on insurance recovery, approximately December 6, 2007.

Mr. Galbo and Mr. Gaetanos worked together to obtain that coverage, but kept separate time records and never anticipated, or were authorized, to split their fees with one another or with anyone else. Mr. Galbo wrote two lengthy letters to Hartford, dated February 7, 2008 and April 18, 2008, and Mr. Gaetanos and Mr. Galbo put considerable time into researching coverage for the separate issues of defense costs and indemnity. Mr. Galbo had at least two lengthy and difficult negotiating conferences. During one of these conferences, Hartford - not Mr. Galbo or anyone else representing the Defendants - sought to combine the award for defense and indemnity. Mr. Galbo insisted that this was legally improper, and eventually, Hartford dropped the point. Finally, on or about May 6, 2008, Hartford agreed to make the payments described in Hartford's May 30, 2008 letter.

Shortly after Mr. Gaetanos received confirmation of Hartford's decision to cover the indemnity, he contacted Mr. Dunnegan. The premise for this contact had not changed from the

one discussed months before: the Defendants did not have money and they wished to put the matter behind them sooner rather than later.

Referring back to the present value analysis: at 6%, the present value of the agreed and ordered settlement amount was $60,102.21; at 7%, it is 58,300.57; and at 8%, it is $56,674.97. TBG offered Plaintiffs a total of $58,000, $25,000 paid in March 2008 and the balance ($33,000, which is the indemnity payment that TBG's insurer agreed to pay after a lengthy and difficult negotiation less the cost of getting it), payable immediately upon acceptance of the reasonable offer described above. *This is 96.5% of the 6% present value, 99.5% of the 7% present value and 102% of the 8% present value.* From insolvent debtors. With no further risk. Plaintiffs rejected this offer, and countered with offers that were considerably higher but that had little, if any, basis in law or logic.

When Mr. Gaetanos spoke with Mr. Dunnegan on June 3, he became angry at the prospect of even discussing a resolution. The troubling part though is that Plaintiffs should not be afforded the privilege to reject nearly total payment and then blame TBG. Mr Dunnegan insisted that the Plaintiffs have a "rock-solid" claim of nondischargeability against Mr. Stirling in his bankruptcy, and therefore they had no reason to negotiate.[3] This aggressive use of the bankruptcy laws is, apparently, quite acceptable, but Mr. Gaetanos's reminder that, in a bankruptcy, the March 1 payment might be subject to a preference recaptures constitutes a

---

[3]    **We treat this as a threat, on par with my own observation to Mr. Dunnegan about the risks to is client in bankruptcy.**

"threat." To TBG, it sounds like a double standard, more of what amounts to a sort of junk law that has characterized the better part of Plaintiffs' prosecution of this case.

On or about May 23, 2008, Mr. Dunnegan responded to Mr. Gaetanos by inquiring whether Mr. Gaetanos "was interested in compensating Mr. Galbo from the portion of fees that you have already received." As noted in Mr. Gaetanos's Declaration, this concept presents ethical issues, but even if there were none, it is irrational. The defense and indemnity obligations of an insurer are separate obligations. "The duty to defend . . . is not the same as the duty to indemnify. The duty to defend arises at the earliest stages of litigation and generally exists regardless of whether the insured is ultimately found liable." *INA Ins. Co. of N. Am. v. Valley Forge Ins. Co.*, 150 Ariz. 248 (App.1986).[4] And as Hartford's May 30, 2008 letter indicates, the insurance award was made on these two different bases: defense and indemnity.

Mr. Dunnegan also asked whether "[i]f [Mr. Gaetanos] collected 99% of [his] claim, is it fair to pay plaintiffs 50 percent." This, of course, is inaccurate; Plaintiffs are being offered 96.5% percent, but this is less troublesome than the underlying comparison, which is just plain stupid, at best. That it was stated at all, especially in the context of the underlying law concerning the difference between defense and indemnity duties and given Hartford's May 30, 2008 letter in which Hartford itself separated the two awards, betrays the Plaintiffs' outright greed and mean-spiritedness. Plainly, for Plaintiffs any reference to what's "fair" is merely a one-sided calculation.

---

[4]     We cite only to Arizona law because TBG operated only in Arizona, the state in which the policy was acquired, issued and delivered.

He described the entire attempt to negotiate a resolution to the problem – TBG's lack of funds, Plaintiffs' lack of payment, and TBG's and Mr. Stirling's general desire to get this case behind him on fair terms to all - as a "fraud." He criticized Mr. Gaetanos for calling in the first place, as if an attempt even to try to work things out without court involvement was itself contemptuous. He first insisted on payment in full of the accelerated $51,000, which was accelerated (of course) because neither Defendant had the funds or the assets to pay it initially. Then he demanded all $38,000 of Hartford's indemnity award, plus another "12 over time," which Mr. Gaetanos took to mean another $12,000 dollars, for a total of $50,000, an odd request coming from parties whose first "over time" arrangement with the same debtor has turned out to be somewhat less than ideal. He made these demands of Defendants who, by all measures, appear to have few resources.

He did not tell Mr. Gaetanos that he had written directly to or otherwise contacted Hartford. It is just startling to have to contemplate this overreaching on the part of Plaintiffs – companies with billions of dollars in assets, revenues and profits - to acquire more than what they need or deserve . . . or bargained for or (depending on present value assumptions) what was ordered, all against a very weak defendant.

According to Mr. Gaetanos's recollection of a conversation he had with Mr. Galbo on June 3, 2008, Mr. Dunnegan made a demand of Mr. Galbo for the entire $38,000.[5]

---

[5]    Given the present value analyses referenced above, a payment to Plaintiffs of the full $38,000 indemnity award means that they will have been paid $63,000 (the original $25,000 plus the $38,000). This is nearly $3,000 more (about 105%) than the amount due under the 6% present value, about $4,700 (about

11

But under either demand, the most stupefying things about them are these:  Plaintiffs are demanding complete payment from a fund – the insurance proceeds – that they not only did nothing to create but that was ultimately created from a source Plaintiff's counsel once expressly rejected as being unworthy of further effort; they want one lawyer to split his fee with another, when in fact neither engaged the other (TBG engaged both, separately) and both worked and billed separately for separate work performed; they want one lawyer to become responsible for the financial obligations of his client; and they want all things, purely by coincidence of course, when they realized fairly late in the game that   In short, they want something for not causing trouble they have no right to cause.  This negotiating posture, and this motion, represent nothing more than a backhanded shakedown.

Or in other words, TBG – by pursuing its insurance claim (for months, at its expense and effort) when it had no duty to do so, when it could have resolved things promptly and decisively (and to the Plaintiffs' serious detriment) by filing bankruptcy at any time from the commencement of the action until even now, and by offering the net proceeds of the indemnity portion of that recovery (which is the only part of it that Plaintiffs have any claim – such as it might be - at all to) after deduction for the legal fees that it took to get it, and by offering immediate payment of 96.5% of the present value of the settlement amount (instead of payment over ten years) has "been reasonably diligent and energetic in attempting to accomplish what was

---

108%) more than the 7% present value; and about $7,300 more (about 111%) than the amount due under the 8% present value.

This is just one of the reasons that I made the assertion that the Plaintiffs are being avaricious in the matter.

ordered." *Powell v. Ward*, 643 F.2d 924, 932 (2nd Cir. 1981) (internal citation and quotes omitted), *cert. denied* 454 U.S. 832 (1981). *See King v. Allied Vision, Ltd.*, 65 F.2d 1051, 1058 (2nd Cir. 1995) ("*Allied Vision*") ("the contemnor [must] diligently attempt[] to comply in a reasonable manner"); *Terry*, 886 F.2d at 1351 (the contemnor must "diligently attempt[] in a reasonable manner to comply"); *EEOC v. Local 638, Local 28 of Sheet Metal Workers' Int'l Ass'n*, 753 F.2d 1172, 1178 (2d Cir.1985), *aff'd*,478 U.S. 421 (1986) ("Local 638"). TBG did all of these things, and more, with the active assistance of counsel: Messrs. Galbo and Gaetanos, who were working for TBG on a contingency basis, and Mr. Stirling's bankruptcy counsel; it's not as though either of the Defendants was blithely ignoring either the Court or the Plaintiffs.


## ARGUMENT


It is difficult to overstate the recklessness, greed, frivolity and mean-spiritedness of Plaintiffs' motion for contempt. The motion is constituted as a succession of disjointed facts, with desultory references to – not always accurate, current or complete – legal principles, and accented by what might be called innuendo except for being so vague (the vagueness itself begging the question of relevance, among others). Put more eloquently, the motion for contempt is little more than a collection of "impulse[s that] . . . express themselves . . . only in . . . irritable mental gestures which seek to resemble ideas." Lionel Trilling, THE LIBERAL IMAGINATION: ESSAYS ON LITERATURE AND SOCIETY 5 (1950).


The aim of civil contempt is "either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past

noncompliance. *See United States v. United Mine Workers of America*, 330 U.S. 258, 303-04; *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 56 (2d Cir.), *cert. denied*,459 U.S. 832 (1982). Compensatory sanctions should reimburse the injured party for its actual damages. *United Mine Workers*, 330 U.S. at 304."[6]

The standard for civil contempt in this Circuit has been expressed by the courts in this Circuit clearly, repeatedly and recently: in order "[t]o establish contempt, 'a <u>movant</u> must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.'" Emphasis added. *Perez v. Danbury Hospital*, 347 F.2d 419 (2nd Cir. 2003), quoting *Allied Vision*, 65 F.2d at 1058. *Accord, Terry*, 886 F.2d at 1351; and *Local 638*, 753 F.2d at 1178. [7]

The oldest of the above cases, *Local 638*, was decided in 1985 and judging by its citation history, is a seminal case in the Second Circuit on the subject of civil contempt. *Local 638* was decided after the *Donovan v. Sovereign Security, Ltd.*, 726 F.2d 55 (2nd Cir 1983), which Plaintiffs cite both for the standard and burden of proof and as authority for the proposition that

---

[6]    Plaintiffs have alleged no actual damages, except attorneys' fees, which are pegged at $10,000 but not substantiated.  Frankly, under the circumstances, this is an amazingly high amount for what appears to be quite thrifty work, much of it repeated from the earlier contempt motion

       Of course, Plaintiffs ostensibly have been damaged by not being paid.  But TBG did offer them 96.5% of a generously computed present value, so . . . perhaps Plaintiffs have been damaged by the missing 3.5%, or $2,103.58.  Perhaps.

[7]    "In light of . . . restraints on the district court's contempt power, [the 2nd Circuit's] review of a contempt order for abuse of discretion is more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted." *United States v. Local 1804-1, International Longshoremen's Association, AFL-CIO*, 44 F.3d 1091 (2nd Cir. 1995).  Appellate "review of a contempt order is more exacting than under the ordinary abuse-of-discretion standard because a district court's contempt power is narrowly circumscribed." *Perez v. Danbury Hospital*, 347 F.3d 419 (2nd Cir. 2003).

contempt is available for money defaults.  We address the latter point later in this Memorandum. The most recent of the cases, *Perez,* was decided only five years ago but a full generation after *Sovereign Security.*  One is left to wonder why Plaintiffs did (or would) not cite any of the above decisions, especially since they appear to mitigate the standard and burden of proof rules that *Sovereign Security*, citing authority from outside this Circuit, appeared to impose.

In a civil contempt, the court "must . . . consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired."  *United Mine Workers of America*, 330 U.S. at 303.  As well, in instances where the court is inclined to use the contempt sanction "as a punishment or as a means of securing future compliance, [it must] consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant."  *Ibid.  See Dole Fresh Fruit Co. v. United Banana Co.,* 821 F.2d 106, 110 (2d Cir.1987).

And, it has been recognized for a very long time that an individual's inability to comply with a court's order is a defense to a contempt motion.  *Shillitani v. United States*, 384 U.S. 364 (1966)

As applied, these standards suggest that the contempt sanction is inappropriate in this instance.  Given the purposes recited above and in United Mine Workers, If TBG could comply, it would – as it did concerning the first payment.  Had TBG (and Mr. Stirling) been utterly wanton with respect to Plaintiffs' allegations and the Court's Final Judgment, it could have

avoided, with ease and with considerably less expense and aggravation. It is fair to assume, however, that TBG did not expect Plaintiffs to be so petty or malicious.

Given TBG's financial condition, it is hard to see how a contempt order will serve either of these purposes. If TBG had the money, one presumes it would have paid it over by now, or declared bankruptcy a long time ago, well before the Final Judgment. One has to so presume; what would be the point of any other approach? TBG has died a slow and agitated death, period. While that death was certainly hastened (if not triggered) by the Plaintiffs, it had nothing to do with anyone's desire to avoid either the Court's authority or the Final Judgment. TBG simply ran out of money.

According to Perez, the <u>movant</u> has the burden to prove all the elements of civil contempt. We take them in order.

Insofar as the first element is concerned, TBG concedes that that Final Judgment is clear and unambiguous as to those TBG's payment obligations that are the subject of Plaintiffs' motion.

Insofar as the second element is concerned, we reserve the right to contest this at later time, given the Supreme Court's sanctioned definition of the term "clear and convincing" ("evidence which 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and

convincing as to enable [the fact finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.' *In re Jobes*, 108 N.J. 394, 407-8."

Insofar as the third element is concerned, given *Perez*, TBG takes the position that the duty to go forward with proof and the duty of persuasion belongs to Plaintiffs ("a movant must establish . . ."). As to this element, they have not done so. They have asserted nothing to show that TBG did not diligently attempt to comply attempted to comply in a reasonable manner, given its resources and the fact that it was already out of business. The only thing it could do was pursue the insurance claim, which it did, with diligence and expertise . . . and success, itself noteworthy given the paucity of useful allegations in the Complaints. No business or individual has any duty to stay in business or borrow itself further into debt just to pay other debts.

In contrast, TBG has now produced evidence to show all that it did to comply. Even before the Final Judgment was executed, TBG reached contingent fee arrangements with two lawyers to prosecute the underlying case and the insurance claim. TBG instructed its lawyers to purse the indemnity claim (as well as the claim for defense costs); it could have chosen to ignore the claim altogether. Once Hartford agreed to pay – as previously noted, with extensive and difficult effort, mostly on the part of Mr. Galbo - it offered all proceeds (less Mr. Galbo's fee) to Plaintiffs, asking only for an acknowledgment of payment, nothing more. This offer computes to 96.5% of the present value of the amount Plaintiffs agreed to accept as of the date of their agreement (assuming a discount rate favorable to them). Plaintiffs declined, and whether or not they have a right to do so, the burdens they create by so declining, by demanding more that their entitlement, by essentially refusing to negotiate further, by threatening even further proceedings

17

and by insisting (without any legal or logical basis) that someone else bear the cost of obtaining insurance proceeds for them, are neither TBG's fault or responsibility.

It is self-evident that TBG cannot comply with the Final Judgment. It has no resources or prospects. Put another way, there is nothing that TBG can do to cure the problem short of paying over all that it has, and all it has is $38,000 in insurance proceeds subject to Mr. Galbo's $5,000 claim and lien. That said, and since the Court "must . . . consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired," and since TBG is out of business, it would seem pointless to impose the contempt sanction. That pointlessness alone warrants denial of the contempt motion, not least because it sets up yet another motion for even more severe sanctions, to which TBG will once again respond: "How are we supposed to make something out of nothing?"

Finally, there is the matter of strange contempt authorities that Plaintiffs cited in their supplemental memorandum of law. Plaintiffs made no effort to connect any of them to the instant matter; they only quoted from decretal or conclusory paragraphs in the opinions. For instance, in *Huber v. Marine Midland Bank*, 51 F.3d 5 (2nd Cir 1995), the court addressed a pro se defendant who: (a) was the subject of three contempt proceedings over the course of a year; (b) made misstatement of fact in court filings and had "acted in bad faith, vexatiously, wantonly and for oppressive reasons . . . and implemented a scheme to harass [the defendant] by running up the cost of litigation. . . ."; (c) started four different law suits in an attempt to avoid student loan repayments; (d) refused to pay fines imposed by the district court; (e) refused to repay his

student loans "as a matter of principle"; and (f) treated the court's orders as "requests." Under these circumstances, and more, the Second Circuit upheld the district court's contempt sanction. With TBG, we have a defendant who is two months in arrears on one payment but tried and largely succeeded in obtaining sufficient funds to pay off the debt to Plaintiffs (96.5%, about $2,000 dollars). There is no comparison between the facts of *Huber* and the facts concerning TBG, and it is our view that *Huber* is not only inapplicable to the matter at hand but was cited merely to harass TBG.

In *Spectacular Venture, L.P. v. World Star International, Inc.*, 927 F. Supp. 683 (S.D.N.Y. 1996), the plaintiff therein filed three contempt proceedings (against the same parties, not – as here – one against one party and then another proceeding against another party.[8] The accused parties therein made no payments toward their debts or any arrangements to make any payments. The Court found the accused parties in contempt *for a fourth time*. As with *Huber*, the relevance of *World Star* eludes us.

*Securities and Exchange Commission v. Bremont*, 2003 WL 21398932 (S.D.N.Y. 2003) is an unreported case. It concerns a defendant who owed roughly $1.6 million, paid none of it and claimed he could not pay any portion of it, in spite of: (a) having received over $2 million in brokering transactions that did not close; (b) transferred $1.7 million to himself or entities that he controlled; (c) used the Fifth Amendment to stymie document production; (d) bought, financed, refinanced, improved and then sold for a large profit a home; (e) etc., etc., etc. Quite candidly, it

---

[8]       By splitting up the proceedings, Plaintiffs have doubled the work that Defendants and their lawyers have had to do. We see this as harassment. There is no reason that Plaintiffs could not have combined the contempt proceedings.

19

is infuriating, and entirely unnecessary to have to deal with senselessness of this sort.  The entire supplemental memorandum consists of cases as utterly irrelevant to the case at hand as this one.

In *Mingoia v. American Lath & Plaster*, 2005 WL 3071271 (S.D.N.Y, 2005), also unreported, the defendant repeatedly ignored requests to pay, committed other defaults, ignored several letters from the plaintiffs and "failed to exercise diligence in attempting to comply with the" court's order.  As well, the decision appears to ignore the holdings in *Perez, Allied Vision, Terry or Local 638* concerning the burden of going forward and of persuasion, even though each had been decided by the time *Mingoia* was decided.  Once again, the relevance of this case to the instant case is tenuous, at the very best.

And in *United States Securities and Exchange Commission v. Universal Express, Inc.*, 2008 WL 1790437 (S.D.N.Y. 2008), presently unreported, we have another securities law defendant who was ordered to pay millions, and who did not do so despite the fact that he had a recurring cash flow of millions.  It may be dull to say same thing again and again but . . . this case simply offers no guidance for the matter at hand.

All in all, the cases cited in the supplemental memorandum are worthless, and the only apparent purpose we can discern from the Plaintiffs' having cited them is that they support our view that the contempt motion is motivated strictly to torment TBG (and indirectly, Mr. Stirling), in the hopes that one or the other will give up more than they are obligated to.

## CONCLUSION

20

Even if the Court accepts each of Plaintiffs' characterizations of TBG's behavior, even if the Court concludes that TBG and its representatives have played the game with extra cards, unassailable facts remain:  Plaintiffs have it within their power to accept TBG's offer to pay 96.5% of the present value of the deal they struck in March 2008.  This is not contemptuous; it is a fact of the economic life that afflicts TBG.  Whatever they do in that regard, the responsibility is theirs and theirs alone.

For reasons set forth above, and in the Gaetanos Declaration and Galbo Affidavit, and on principles of equity and common sense, TBG respectfully requests that the Court deny Plaintiffs motion, in its entirety.  In our view, Plaintiffs have not made out even a *prima facie* case for contempt.

In the alternative, TBG respectfully requests an evidentiary hearing, at which Plaintiffs can offer direct evidence on the subject of the contempt motion and TBG can offer further evidence in rebuttal.

In addition, under the circumstances, TBG respectfully requests that the Court require Plaintiffs to pay for the value of TBG's counsel's attorneys' fees and disbursements, on the ground that this motion is frivolous, largely unfounded and needlessly increases the cost of litigation.  We cannot now supply even an estimate of these fees/disbursements, but we will do so as the Court instructs..

Executed on June 13, 2008

21

**AMIGONE, SANCHEZ, MATTREY**
**& MARSHALL, LLP**

By:    /s/ Christ Gaetanos
        Christ Gaetanos, Esq. (CG 5572)
        Attorneys for Defendant
         The Textbook Guy, LLC
        1300 Main Place Tower
        Buffalo, New York 14202
        Phone:  716-852-1300
        E-Mail:  cgaetanos@att.net

TO:    WILLIAM DUNNEGAN
      Dunnegan, LLC
      Attorneys for Plaintiffs
      350 Fifth Avenue
      New York, New York 10118
      212-332-8300

22