```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```
---

| | |
|---|---|
| **PEARSON EDUCATION, INC.,**<br>**JOHN WILEY & SONS, INC.,**<br>**CENGAGE LEARNING, INC., AND**<br>**THE McGRAW-HILL COMPANIES, INC.,**<br><br>                Plaintiffs,<br><br>    vs.<br><br>**THE TEXTBOOK GUY, LLC**<br>**d/b/a THETEXTBOOKGUY.COM,**<br>**MATTHEW STIRLING and**<br>**JOHN DOES #1-5,**<br><br>                Defendants. | 07-CIV-7890 (PKC)<br><br>DECLARATION OF RICHARD<br>A. GALBO IN OPPOSITION<br>TO PLAINTIFFS' MOTION<br>FOR CONTEMPT |

---

**RICHARD A. GALBO, ESQ.**, hereby declares pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.  I am an attorney duly licensed to practice in the State of New York and am principal of Galbo & Associates. I am not a party or attorney of record for any party in this action.

2.  I was retained by The Textbook Guy, LLC (hereinafter "TTG") for the limited purpose of pursuing its legal rights under a Commercial General Liability Insurance Policy issued by Hartford Casualty Insurance ("Hartford") to TTG following Hartford's disclaimer of defense and indemnification for this action by letter of December 12, 2007.

3.  As a result of my efforts Hartford agreed to pay TTG the sum of $38,000 to indemnify TTG for one half of the settlement amount of $76,000 agreed to in this action, and to pay

all of the legal fees of Amigone, Sanchez, Mattrey & Marshall (hereinafter "Amigone, Sanchez") for their defense of this action in the sum of $35,000, consistent with Hartford's duty to defend its insured. This agreement was a full and final settlement of the insurance dispute between Hartford and TTG.

4.  In furtherance of the settlement of the insurance claim, a check in the amount of $38,000 payable to Galbo & Associates as attorneys and The Textbook Guy, LLC was forwarded by Hartford, endorsed by TTG to Galbo & Associates and deposited in my firm's client trust account on June 4, 2008. (A copy of the check and deposit receipt is attached as Exhibit A.)

5.  The sum of $38,000 has remained in my firm's client trust account in full and no funds have been withdrawn from this account for the payment of my legal fee. (Attached as Exhibit "B" is the Customer Account Statement from Citizens Bank for the month of June 2008 showing the deposit of the $38,000 on June 4, 2008 and the fact that the entire amount of these funds has remained on deposit, without any withdrawals, through and including June 30, 2008.)

6.  At the request of TTG and their counsel, I have been authorized to release the funds from the Client Trust Account and have issued Check Number 104 payable to Dunnigan LLC as attorneys in the amount of $38,000. (A copy of this check is attached as Exhibit "C".)

7. Once the proceeds of the settlement of the insurance dispute between TTG and Hartford were received and deposited in my firm's client trust account, the limited scope of my engagement with TTG ended. I have not represented TTG in any proceedings in this action or advised TTG in any matters regarding the advisability of it seeking bankruptcy protection. TTG had engaged separate counsel for both of these matters.

8. Until the issuance of Check Number 104 from my firm's client trust fund on June 27, 2008, I was not authorized by TTG to unconditionally issue payment to the Plaintiffs in this matter.

9. At all times, the funds have remained in the client trust account and I have acted as escrow agent on behalf of The Textbook Guy, LLC.

10. Mr. Dunnigan was well aware that these funds were received from Hartford and maintained in my firm's client trust account. He was also well aware that I had not received instructions from my client to unconditionally discharge these funds, as noted in his Memorandum of Law in support of this motion. Finally, Mr. Dunnigan has never made written demand upon the undersigned for payment of these funds. Instead, Mr. Dunnigan served upon the undersigned a Restraining Notice dated June 4, 2008, mailed from New York, New York to Buffalo, New York on June 5, 2008, and received by the undersigned on June 9, 2008. (A copy of the Restraining Notice is attached as Exhibit "D".)

11. Pursuant to the Restraining Notice, all funds have been preserved in the Client Trust Account that were deposited therein on June 4, 2008.

12. After my initial evaluation of Hartford's position concerning coverage and the response by Hartford representative, Dianne DiFranco, that Hartford would continue to deny coverage, I was advised by TTG that it could not pay for additional legal services to continue my efforts to pursue its rights under the Hartford policy. TTG stated that any fees for legal services would have to come from payments recovered from the Hartford on behalf of TTG. I agreed to this arrangement with TTG.

13. After recovering $38,000 in indemnity payments on behalf of TTG, a fact disclosed to Mr. Dunnegan by Mr. Gaetanos, I spoke to Mr. Dunnegan by telephone in our only communication about this matter. He expressed his displeasure at my claim to a legal fee. I was surprised by this since it was only through my efforts that any monies became available to satisfy the remainder of the judgment in this matter and I believe I have a valid retaining lien on the proceeds.

14. As a result of this telephone conversation, it became apparent my fee would become an issue in this matter. Furthermore, throughout my representation of TTG I have been advised by Mr. Stirling and Mr. Gaetanos that TTG was contemplating seeking bankruptcy protection. Finally, I was served with a Restraining Notice as stated above. For these

Case 1:07-cv-07890-PKC   Document 50   Filed 07/01/2008   Page 5 of 12

reasons, I determined it would not be appropriate to withdraw my fee from my firm's client trust account and I have not done so, contrary to Plaintiffs' allegations in support of this motion.

15. The insurance dispute with Hartford involved: analyzing the Complaint and Amended Complaint in this action, reviewing the Hartford policy, determining which state law to applied to the interpretation of the policy, assessing the applicability of exclusions raised by Hartford, determining the validity of the violation of policy conditions as a defense to coverage, determining the duty of Hartford to defend TTG in this action and determining the extent to which a duty to indemnify existed based upon the claims that could be proven against TTG by the plaintiffs in this action.

16. These efforts resulted in two lengthy letters to Hartford, dated February 7, 2008 and April 18, 2008. (Copies are attached as Exhibit "E".) There were also negotiations with Hartford representative Dianne DiFranco that occurred over the telephone as Hartford did not respond in writing to my letters objecting to their coverage position. These efforts ultimately resulted in a settlement of the coverage dispute.

17. The Hartford policy covered only a period from July 26, 2007 to October 31, 2007 for personal and advertising injury that occurred during this limited period. The Complaint in this action did not specifically state the period over which the alleged offenses occurred. Hartford denied coverage on the basis

that there were no offenses that occurred within it policy period.

18. To prove that Hartford had an obligation to indemnify required proof that the alleged damages, if any, occurred during this period even though TTG was in business for several years and the policy covered only three months. To do so through coverage litigation would have required TTG to prove the damages sustained by the Plaintiffs occurred only during this period in order to be fully indemnified for the settlement amount of $76,000.

19. In my opinion this was not possible as I was unaware of any proof that conclusively established this. Furthermore, coverage litigation would have required the services of counsel skilled in intellectual property law to assist in the coverage litigation and in essence, that a trial of the underlying action be conducted within the coverage litigation to prove that the damages alleged were sustained during the limited period covered by the Hartford policy. All of which would have cost well in excess of the amount at issue, $76,000. As such, a settlement for $38,000 not only was advisable, but the only realistic option since the Hartford ardently maintained that little if any damages were sustained during the three months of their policy.

20. The second and problematic coverage defense to confront in persuading Hartford to indemnify TTG for this claim related to Exclusion B.1.p.(7) of the Personal and Advertising Coverage B. of the policy. This exclusion relieved Hartford of any

6

obligation under the policy for any claim arising out of a violation of any intellectual property right including claims of copyright and trademark infringement. The exclusion contained an exception for claims of infringement of copyright in TTG's advertisements. It is this narrow exception that was the basis to claim Hartford owed a duty to defend the claim and at least some duty to indemnify for a portion of the settlement amount.

21. The Complaint and Amended Complaint in this action did not allege that Plaintiffs' copyrights were violated as of result of TTG's advertisements. Rather, that TTG violated Plaintiffs' copyrights in the sale of foreign editions of textbooks to the U.S. market. It was the absence of any allegation of copyright infringement in TTG's advertisements that lead Hartford to decline coverage in this matter. This was a substantial impediment in establishing Hartford owed a duty to defend and indemnify TTG in this action.

22. On TTG's behalf I argued that advertising is implied by the allegations that TTG sold books in violation of copyright laws because it sold its books through the internet and this required sales be made utilizing advertisements; that internet postings of books for sale were in themselves advertisements. However, it is my understanding that it is the sale and not the advertisement for sale that creates the liability under copyright law. This created serious doubt about whether any covered claim was presented by this action. Again suggesting that a settlement

7

with Hartford was in order regarding its obligation to indemnify TTG for its settlement of this action.

23. These issues continued to be raised by Hartford during the course of negotiating a resolution of the coverage dispute and Hartford's position is summarized in Ms. DiFranco's letter to Mr. Dunnegan dated May 30, 2008. (A copy is attached as Exhibit "F".)

24. The third impediment to establishing Hartford's liability under the policy was Exclusion B.1.a., excluding intentional personal and advertising injury. The Complaint in this action alleged that TTG willfully infringed upon Plaintiffs' copyrights. Hartford therefore declined coverage based upon this exclusion. TTG maintained it unwittingly violated the copyright laws when it sold the foreign editions. If coverage litigation had ensued, the intent of TTG would have been at issue.

25. Given that TTG would have been required to prove in coverage litigation that all of plaintiffs' damages arose from copyright infringements in its advertisements, during the three month period covered by the policy, and that all infringements were unintended, there was serious doubt such litigation would have succeeded and Hartford held liable to indemnify TTG for the entire $76,000 settlement amount. As a consequence, I advised TTG to negotiate a settlement of the indemnity obligation. Two thirds of the settlement amount was demanded in the hope of achieving a settlement of one third of the settlement amount.

Through persistent negotiating, a settlement of one half or $38,000 was reached.

26. In contrast to Hartford's duty to indemnify, which would require proof of actual covered damages, the duty to defend is much broader. Under both New York and Arizona law, the duty to defend is triggered if the Complaint suggests any possible factual or legal basis upon which Hartford may have an obligation to indemnify in any respect. If this is the case, then Hartford must pay for the entire defense of TTG. The duty to defend would be determined in coverage litigation as a matter of law. This is the case even where the Complaint does not itself allege a covered claim as both Arizona and New York law allows TTG to offer Hartford facts outside of the Complaint to establish its duty to defend. This is precisely what was stated in the two letters sent to Hartford to establish the duty to defend. That is, that TTG accomplished all of its sales through advertisements, suggesting the possibility of a copyright infringement in TTG's advertisements, even though this was not alleged in the complaint.

27. If the duty to defend is established, it is absolute requiring Hartford to provide TTG a full defense to the action regardless of whether any indemnification is actually owed. After much resistance by Hartford, it acknowledged it owed a duty to defend TTG and thus agreed to pay in full the legal bill of Amigone, Sanchez previously presented to it, since Hartford had

not on its own undertaken to defend TTG in this matter as it was obligated to do under the policy.

28. In my letter of April 18, 2008 to Dianne DiFranco of the Hartford I enclosed the legal bill of Amigone, Sanchez in the amount of $35,249.41 for payment. For ease of negotiation, I demanded that the bill be paid in the amount of $35,000 and Hartford agreed once it acknowledged its obligation to defend. In a subsequent telephone conversation, Ms. DiFranco inquired as to whether TTG had paid these legal fees. I advised that the fees remained unpaid and she indicated that Hartford would pay the fees owed directly to Amigone, Sanchez.

29. Ms. DiFranco's letter of May 30, 2008 to Mr. Dunnegan does not indicate that any sum other than $38,000 was paid by Hartford for indemnification of TTG for the settlement and judgment. Rather, Ms. DiFranco's letter to the undersigned of May 30, 2008 (attached hereto as Exhibit "G") encloses two checks. Ms. DiFranco states that the first check of $35,000 covers post-tender defense costs and the second check of $38,000 covers Hartford's agreement to pay one half of the judgment entered against TTG in this action. The check for $35,000 states on its face: "Nature of Payment: legal expense", while the check for $38,000 states on its face: "Nature of Payment: settlement". This is consistent with my negotiation of the settlement of Hartford's obligation to defend, by paying in full the legal bill of Amigone, Sanchez, and the compromise of Hartford's potential

10

duty to indemnify, by paying half of the settlement and judgment owed by TTG for the reasons stated herein.

30. It was the expectation of the undersigned that consistent with the settlement of the insurance dispute that Hartford would issue payment for legal fees directly to Amigone, Sanchez TTG would not be entitled to receive these funds as reimbursement since it had not paid the legal bill. Instead, after MS. DiFranco received a telephone call from Mr. Dunnegan and his letter of May 28, 3008, the check was made payable to TTG and to Galbo & Associates, even though the check was clearly for the payment of the Amigone, Sanchez legal bill.

31. The check was endorsed to the firm consistent with the settlement of the insurance dispute and the understanding of the undersigned, TTG and Hartford regarding the reason for this payment by Hartford. As a consequence, at no time did the undersigned divert funds, or convince others to divert funds, that TTG was entitled to receive under the settlement of the insurance dispute. To the contrary, all funds were paid to the proper parties consistent with the settlement of the insurance dispute, the understanding of Hartford and TTG, and the law regarding the duty to defend and to indemnify.

32. Other than the undersigned's agreement with TTG to receive a fee from the proceeds payable to TTG by Hartford, a fact fully disclosed to Mr. Dunnegan, I had and have no financial interest or other interest in any of the payments made by

11

Hartford to settle the insurance dispute. As such, I had no reason to improperly direct any of the settlement proceeds and did not do so. Instead, I acted consistent with the settlement agreement between Hartford and TTG and the understanding of the parties to that agreement.

33. Therefore, there is no basis to claim the undersigned is in contempt of any Order of this Court and the undersigned respectfully request that the Court deny the plaintiffs' motion as to the undersigned.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Richard A. Galbo, Esq.