EXHIBIT "E"

GALBO & ASSOCIATES
Attorneys at Law
1830 Liberty Building
Buffalo, NY 14202
716.332.0151 fax: 716.332.0153
rgalbo@galbolaw.com

Richard A. Galbo
Leo C. Kellett

February 7, 2008

**VIA E-MAIL & US MAIL**

Deborah Hauser
Lake Success Commercial Claims Center
One Hollow Lake
Lake Success, NY 11042

**Re: Pearson Education, Inc., et al. v. Matthew Stirling d/b/a thetextbookguy.com**
**Your File No. YRV 32276**
**Our File No. 08-006**

Dear Ms. Hauser:

Our office represents Matthew Stirling in his coverage claim against Hartford Casualty Insurance Company. We are writing in response to Hartford's December 12, 2007 letter disclaiming coverage for the above action. For the reasons discussed below, the coverage limitations and defenses raised in the disclaimer letter do not eliminate coverage for the action, and we ask that Hartford honor its obligations to defend and potentially indemnify Mr. Stirling.

Shortly after Hartford issued its disclaimer letter, the plaintiffs served an Amended Complaint dated December 14, 2007, a copy of which is enclosed. It is substantially identical to the original, except that paragraph 17 of the original Complaint was eliminated and the plaintiffs listed additional copyrights and trademarks.

**1. The plaintiffs allege offenses that occurred during the policy period.**

We understand that Hartford issued Policy Number 01 SBA RD6021 to The Textbook Guy LLC ("Textbook") effective July 26, 2007, and that the policy was cancelled on October 30, 2007. Section A.1.b.(2) of Business Liability Coverage Form SS 00 08 04 05 of the policy provides in part that: "b. This insurance applies: . . . (2) To 'personal and advertising injury' caused by an offense arising out of your business, but only if the offense was committed . . . during the policy period." The disclaimer letter states on page 1: "The complaint does not indicate the dates that the alleged infringements occurred and we are unable to determine if the allegations fall within the policy period of July 26, 2007 through October 31, 2007."

Paragraph 22 of the original Complaint (paragraphs 21 of the Amended Complaint) states:

> Defendants have without permission purchased Foreign Editions of plaintiffs' books manufactured outside of the United States and resold them to purchasers in the United States through the Internet at the websites thetextbookguy.com, TextbookX.com, A1books.com, and eBay.com. <u>As of the filing of this complaint, defendant had one hundred and eighty titles for sale at eBay.com.</u>

(Emphasis added.)

The original Complaint was filed on September 7, 2007, during the policy period. Therefore, paragraph 22 indicates that allegedly infringing activities occurred on September 7, 2007, during the policy period. Moreover, Mr. Stirling acknowledges that allegedly infringing activities occurred during the policy period. Therefore, although this coverage limitation may limit Hartford's obligation to indemnify, it does not eliminate its duty to defend.

**2. Mr. Stirling is covered as an insured for the action.**

The disclaimer letter next states on pages 1-2: "Under Who Is An Insured C.1.c. Matthew Stirling may

qualify as an insured as a member of [Textbook], but only with respect to the conduct of Textbook's business." Section C.1.c. of the Business Liability Coverage Form provides: "1. If you are designated in the Declarations as: . . . c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers."

All activities alleged in the Complaint were performed by Mr. Stirling as the sole owner and officer of Textbook. Mr. Stirling was not acting on behalf of any other person or entity with respect to the activities alleged in the complaint. Consequently, the requirements for insured status do not limit coverage for Mr. Stirling.

**3. Exclusion B.1.p.(7) does not exclude coverage for the action.**

Page 2 of the disclaimer letter states that Textbook's policy contains:

> [A]n exclusion applicable to trademark claims: Exclusion p.(7) excludes personal and advertising injury arising out of any violation of any intellectual property rights, such as copyright and trademark. The policy provides a limited exception to this exclusion to the extent that it does not apply to infringement in the insured's "advertisement", as that term is defined, of copyright. However, the limited exception would not be pertinent because the complaint does not allege infringement of copyright in an "advertisement" by Textbook.

Textbook's policy was issued to its main place of business in Arizona. It contains a number of Arizona endorsements and none for any other state. In addition, the risks insured apparently do not have a specific predominant location outside of Arizona. Consequently, the interpretation of the policy will be governed by Arizona law.

Under Arizona law, exclusion B.2.p.(7) and its exception must be analyzed in relation to terms defining

the scope of the relevant coverage. (See, e.g., Sparks v. Republic Nat'l Life Ins. Co., 647 P.2d 1127, 1134 (Ariz., 1982), quoting Federal Ins. Co. v. P.A.T. Homes, Inc., 547 P.2d 1050, 1053 (Ariz., 1976)("[T]he policy must be read as a whole in order to give a reasonable and harmonious meaning and effect to all its provisions."); Ariz. Rev. Stat. § 20-1119 ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy . . . .").) Ambiguities are to be resolved in favor of the insured. (See, e.g., Security Ins. Co. of Hartford v. Anderson, 763 P.2d 246, 248 (Ariz., 1988).)

The insuring agreement of section A.1.a. of the Business Liability Coverage Form provides in part that: "We [Hartford] will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'personal and advertising injury' to which this insurance applies." "Personal and advertising injury" is defined to include "injury . . . arising out of . . . [i]nfringement of copyright, . . . or title of any literary . . . work, in your 'advertisement'".

Exclusion B.1.p.(7) excludes coverage for "personal and advertising injury" "[a]rising out of any violation of any intellectual property rights such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity." The exception provides that "this exclusion does not apply to infringement, in your 'advertisement', of (a) Copyright . . . or (c) Title of any literary . . . work."

Consequently, the exception to Exclusion B.1.p.(7) ensures the continued availability of Hartford's coverage for "sums that the insured becomes legally obligated to pay as damage because of" "injury . . . arising out of . . . [i]nfringement of copyright . . . or title of any literary . . . work, in [the insured's] 'advertisement'". Those policy terms do not require that the claimant allege that the injury arose out of infringement of copyright or title of literary work in the insured's "advertisement", only that the injury in fact arose out of such infringement. Hartford has a duty to defend any claim involving injuries that potentially arose out of infringement of copyright or title of literary work in Textbook's "advertisement" (see generally, e.g., United Servs. Auto Ass'n v. Morris, 741

P.2d 246, 250 (Ariz., 1987)), and that potential can be established through facts outside the Complaint (see generally, e.g., Kepner v. Western Fire Ins. Co., 509 P.2d 222, 224 (Ariz., 1973); Aetna Cas. & Sur. Co. v. Dannenfeldt, 778 F.Supp. 484, 499 (D. Ariz., 1991)).

"Advertisement" is defined in Textbook's policy to include the "widespread public dissemination of information or images that has the purpose of inducing the sale of goods, products or services through . . . [t]he Internet, but only that part of a web site that is about goods, products or services for the purpose of inducing the sale of goods, products or services". Although not required for coverage, the Complaint itself indicates that infringing advertising is involved in the action against Mr. Stirling.

As previously noted, in paragraph 22 of the original Complaint (paragraph 21 of the Amended Complaint), the plaintiffs allege in part that: "Defendants have without permission purchased Foreign Editions of plaintiffs' books manufactured outside of the United States and resold them to purchasers in the United States through the Internet at the websites thetextbookguy.com, TextbookX.com, A1books.com, and eBay.com." (Emphasis added.) Each of these websites affects sales through "advertisements" as defined in Textbook's policy. Consequently, it is implied in the Complaint that these sales were made through "advertisements". Mr. Stirling has confirmed that sales of foreign editions of the plaintiffs' books were made over the Internet through advertisements listing, among other things, the title of each book, and, at least on websites other than Textbook's, listings were accompanied by an image of the domestic edition of the book. These sales would not have occurred without the solicitation of purchasers through this advertising.

In paragraph 29 of the Complaint (paragraph 28 of the Amended Complaint), without specifying in detail what actions were violative, the plaintiffs allege that: "Defendants have infringed the Pearson, Wiley, Cengage and McGraw-Hill Copyrights in violation of 17 U.S.C. § 501." If, as alleged by the plaintiffs, the sales of the foreign editions were in violation of the copyright law, then the use of the photographs in Textbook's advertisements was itself also in violation of 17 U.S.C. § 106 of the copyright law, and actionable under 17 U.S.C. § 501. (See,

e.g., AMCO Ins. Co. v. Lauren-Spencer, Inc., 500 F.Supp.2d 721 (S.D. Ohio, 2007); Sony Computer Entertainment Am. Inc. v. GameMasters, 87 F.Supp.2d 976, 989 (N.D. Cal., 1999).)

Moreover, Textbook's advertising of foreign editions of the plaintiffs' books using the titles alone potentially involves "infringement of title". In their third claim for relief, the plaintiffs seek injunctive relief and damages for common law unfair competition under state law. Although book titles are not protected under the copyright law (see, e.g., 37 C.F.R. § 202.1(a)), the improper use of a title can potentially serve as the basis for a claim of unfair competition (see generally, e.g., ITC Ltd. v. Punchgini Inc., ____ N.E.2d ____, 2007 WL 4334177 (N.Y. 2007); Fairway Constructors, Inc. v. Ahern, 970 P.2d 954 (Ariz. Ct. App. 1999); see also 15 U.S.C. § 1125). If the plaintiffs prevail in their claims for copyright infringement, trademark infringement, and/or unfair competition, then Textbook's use of the titles of the plaintiffs' books will have amounted to an infringement of the plaintiffs' titles, actionable itself as a form of unfair competition.

The plaintiffs do not expressly state whether they are seeking direct damages for infringement of copyright or title in Textbooks' advertisements. However, in addition to damages and other injunctive relief, in paragraph E. of their demand for relief, they request judgment, "[d]irecting that defendants engage in such additional activities, including, but not limited to, . . . corrective advertising, as may be necessary and appropriate to mitigate the damage defendants have caused". This request indicates that the plaintiffs may be claiming that they were injured by Textbook's advertising itself -- such as through the loss of good-will and/or fostering of an interest in and demand for foreign editions that could undercut sales of domestic editions of the plaintiffs' books - and could be seeking damages for those injuries.

Moreover, the Complaint is brief and terse giving only general notice of the activities for which the plaintiffs seek damages and other relief (see generally, e.g., Fed. R. Civ. P. 8(a); Century 21, Inc. v. Diamond State Ins. Co., 442 F.3d 79, 83 (2nd Cir. 2006)(interpreting New York law)), and Hartford had a duty to investigate and consider the full potential significance of those allegations in

relation to its coverages (see, e.g., Aetna Cas. & Sur. Co. v. Dannenfeldt, supra). Mr. Stirling's counsel for the action, has advised us that the plaintiffs are considering filing a Second Amended Complaint which would clarify their intention to recover damages for injuries directly resulting from infringement in Textbook's advertisements. Therefore, exclusion B.1.p.(7) does not eliminate Hartford's duty to defend.

Even if the plaintiffs do not ultimately request such damages under the currently governing Complaint or a Second Amended Complaint, Hartford may be liable to indemnify Mr. Stirling. If the plaintiffs establish their claim for copyright infringement, trademark infringement, and/or unfair competition claims based on Textbook's sale of foreign editions of the plaintiffs' books, Textbook will necessarily have infringed the plaintiffs' copyrights and/or rights in the titles of the plaintiffs' books in Textbook's advertising of those books. Hartford's coverage applies to damages because of "injury . . . arising out of . . . [i]nfringement of copyright . . . or title of any literary . . . work, in [textbook's] 'advertisement'". Under Arizona law, coverage for liability "arising out of" a particular cause or circumstance is interpreted to apply "when there is a 'causal nexus' sufficient to warrant the conclusion that the [liability creating event] is 'incidental to or connected with'" the covered cause or circumstance. (Transport Indem. Co. v. Carolina Cas. Ins. Co., 652 P.2d 134, 138 (Ariz., 1982); see also, e.g., Regal Homes Inc. v. CNA Ins., 171 P.3d 610, 614 (Ariz. Ct. App. 2007), quoting Farmers Ins. Co. v. Till, 825 P.2d 954, 955 (Ariz. Ct. App., 1992)("The general rule is that the words 'arising out of' are 'broad, general, and comprehensive terms effecting broad coverage.'").)

Textbook's sales of the allegedly infringing foreign editions of the plaintiffs' books clearly "arose out of" its internet advertising of those books under the above test. Since the imposition of liability for sales would also establish that there was in fact infringement of copyright and/or title in Textbook's advertisements, the exception to Exclusion B.1.p.(7) applies, and the exclusion does not exclude coverage.

**4. Exclusion B.1.a.(2) does not eliminate the duty to defend.**

Page 2 of the disclaimer letter further states: "[T]he complaint alleges that the defendant's infringement was committed willfully. Exclusion B.1.a.(2) excludes 'personal and advertising injury' arising out of an offense committed by, at the direction of or with the consent or acquiescence of the insured with the expectation of inflicting 'personal and advertising injury.'"

While the plaintiffs allege willful infringement in paragraphs 31 and 41 of the Complaint (paragraphs 30 and 41 of the Amended Complaint), they also allege infringement without willfulness in paragraphs 29 and 39 of the Complaint (paragraphs 28 and 38 of the Amended Complaint). Under all three of the theories of liability alleged in the Complaint, the plaintiffs can potentially recover damages for non-willful infringement. If the plaintiffs do establish the right to recover, it will be for non-willful infringement, since Mr. Stirling did not know that he was violating the plaintiffs' rights when Textbook advertised and sold foreign editions of the plaintiffs' books. Therefore, exclusion B.1.a.(2) does not eliminate Hartford's duty to defend.

**5. Mr. Stirling's possible breach of the notice conditions of Textbook's policy does not vitiate coverage.**

Page 2 of the disclaimer letter next states:

> It appears that the summons and complaint was served on Textbook on or about September, 2007, but was not referred to Hartford until December 6, 2007. Textbook may have breached policy conditions E.2.b. and c. by failing to notify Hartford of the suit as soon as practicable and by failing to immediately forward a copy of the summons and complaint to Hartford.

However, under Arizona law, a liability insurer has the burden of proving that it was prejudiced by the insured's late notice to effectively disclaim coverage. (See, e.g., Lindus v. Northern Ins. Co. of N.Y., 438 P.2d

311 (Ariz., 1968); Liberty Mut. Fire Ins. Co. v. Mandile, 963 P.2d 295 (Ariz. Ct. App., 1997).) We cannot conceive of how Hartford could have been prejudiced by Mr. Stirling's relatively brief delay in giving notice. Therefore, it is our position that Mr. Stirling's possible breach of the notice conditions does not vitiate coverage.

**6. The plaintiffs' claims for injunctive relief and punitive damages do not relieve Hartford of the duty to defend.**

Finally, page 2 of the disclaimer letter also states:

> Your policy provides coverage for "sums that the insured becomes legally obligated to pay as damages." This language is intended to restrict coverage to claims seeking to recover compensatory damages. Accordingly, there is no coverage for declaratory or injunctive relief, as well as costs, expenses and attorneys' fees, as these demands for relief do not constitute legal damages, and thus, are not the proper subject matter for an indemnity insurance policy. Finally, plaintiff also seeks punitive damages, which are not covered under your policy as the courts of New York have held that it is against public policy for an insurance company to provide coverage for punitive damages assessed against an insured.

As previously discussed, Textbook's policy is most likely governed by the law of Arizona rather than New York. It is not clear whether Arizona law would require indemnification for punitive damages under the facts involved in this action, or for expenses incurred in implementing injunctive relief. In any event, these claims against Mr. Stirling do not eliminate Hartford's duty to defend, since other damages clearly covered by Textbook's policy are also alleged and potentially recoverable. In addition, section A.3.a.(5) of the policy provides that Hartford will pay costs taxed against the insured in a suit that Hartford defends.

Since the plaintiffs are seeking damages that are potentially covered under Textbook's policy and not excluded, Mr. Stirling demands that Hartford honor its

obligations by agreeing to provide him with a defense against the action, through counsel of his own choice, and to reimburse him for defense costs and expenses previously incurred in the defense of this action. He also requests that Hartford indemnify him for damages and expenses covered under the policy.

Please also be advised that Mr. Stirling is attempting to resolve this matter through a settlement, which his attorneys have been negotiating. Hartford's acknowledgement of its obligations could facilitate the settlement and minimize both defense costs and liability. It would also obviate the need for a Declaratory Judgment action against Hartford to enforce your insureds rights under the Policy.

We look forward to Hartford's response.

Very truly yours,
*Richard A. Galbo*
Richard A. Galbo

LCK/wjh

cc: Christ Gaetanos
Matthew Stirling

**GALBO & ASSOCIATES**
Attorneys at Law
1830 Liberty Building
Buffalo, NY 14202
716.332.0151 fax: 716.332.0153
rgalbo@galbolaw.com

Richard A. Galbo
Leo C. Kellett

April 18, 2008

**VIA E-MAIL**

Diane DiFranco
Claim Consultant
The Hartford Insurance Company
One Hollow Lane, Suite 301
Lake Success, NY 11042

**Re: Pearson Education, Inc., et al. v. The Textbook Guy, LLC**
**Your File No. YRV 32276**
**Our File No. 08-006**

Dear Ms. DiFranco:

Attached please find a copy of the bill from Amigone, Sanchez, Mattrey & Marshall, LLP to The Textbook Guy LLC ("TBG" or "insured"), which covers the cost of defending the action against Pearson from the date of tender to The Hartford through to the end of this month, for $35,249.41. As we advised in detail in our previous letter to Deborah Hauser of The Hartford, dated February 7, 2008, it is our position that The Hartford had the absolute duty to defend its insured against this action and therefore is required to pay for the defense of this action.

We will not repeat here all of the reasons stated in our previous letter as to The Hartford's defense obligation except to say that The Hartford policy was issued to "TBG" as the named insured with full knowledge that it was in the business of distributing books, as this activity is listed on the business description contained on the Declarations page of the policy, and with full knowledge of that the policy covers copyright

infringement occurring in the insured's advertisements. Notwithstanding this, I am hopeful that if Hartford more fully understands the insured's activities and the claims made, it will realize that not only did it owe a defense, but indemnity for the settlement as well.

TBG's business was to purchase mostly collegiate-level textbooks and then resell them over the Internet via several websites, including its own, established predominately for the advertising and sale of books generally and textbooks in particular. Most of these books are so-called "foreign editions," which are virtually identical to the domestic edition but intended for sale, and often made outside of the United States.

The Plaintiffs commenced the instant litigation against TBG, which in turn prompted this claim for coverage. They claim that TBG committed copyright violations when it advertised and sold in the United States versions of certain textbooks that were produced for sale strictly within foreign markets. Although the claim is made without much elaboration in the Complaint, elsewhere in this letter we address why such elaboration is unnecessary, given recent Supreme Court precedent and previous copyright precedents, in order for a plaintiff to recover for copyright violations based on advertising.

The insured was unaware that the sale in the United States of textbooks produced for foreign distribution might be a violation of U.S. copyright law. TBG sold virtually all of its books via the Internet. That is, it advertised on websites that its books were available. The insured never maintained a physical location where customers could visit to review and purchase books for sale. Rather, its Internet postings were the only ways in which it could, and did, promote and sell its product.

The postings were themselves the advertisements. They consisted of sale listings at numerous websites, listings that included the title of the book for sale; its author; the numbered edition of the book; its ISBN ("International Standard Book Number"); and often, the condition of the book being sold, the book's general subject matter and a comment or two - which the insured supplied - about the book for sale (such as whether the book was a domestic or foreign edition, any material differences between the two, whether the book was new or used, its popularity, its availability for certain courses, etc.).

Postings of the insured's books for sale on websites other than its own frequently were accompanied by a picture of the cover of the each textbook for sale. (This itself, aside from being an advertisement of a product for sale, is a form of "copying" also subject to the U.S. Copyright Act.)

Typically, the accompanying picture was of the cover of the U.S. edition of the book, even though the book advertised as being for sale was actually the foreign edition. (This potentially false advertising is also claimed to be a copyright violation.) But the key point is this: were it not for these acts of advertising, the insured would not have sold any books. These acts of advertising were the only way the insured called, and was able to call itself and the books it wanted to sell to the attention of the public.

Thus, the circumstances of the insured's actual business operations compel the conclusion that it would be artificial and incorrect to deny coverage by divining a distinction between injury arising from a sale of goods and injury arising from the marketing of these same goods by means of advertisements. For TBG, they are one and the same; there is no meaningful difference between the two activities.

Not incidentally, and as a blunt testament to these facts of the insured's operation and their significance to proving infringement, the Plaintiffs sought "corrective advertising" as one component of their requested relief. More forcefully to the point, the Permanent Injunction and Final Order ("Final Order") in the case (which accompanies this letter) repeatedly enjoins the insured from "advertising." These two examples alone make it very clear that TBG's advertising was not only a serious component of Plaintiffs overall claim against it, but well within the "infringing" behavior that Plaintiffs wanted to curtail and redress in this litigation.

Plaintiffs, in bringing this lawsuit, intend to protect their domestic market for college textbooks by prohibiting the sale of foreign editions of these textbooks in the United States. These foreign editions almost always are produced - and therefore are priced - much, much cheaper than are their U.S. counterparts, even in cases where the domestic and foreign editions are essentially identical. In Plaintiffs' view, the insured - by advertising and selling foreign editions in the United States - encouraged consumers to buy the cheaper version of any given textbook. By bringing suit, the Plaintiffs intend

to discourage, and perhaps eliminate, any consumer expectations - which, for practical purposes, they blame on the insured - that they can beat the Plaintiffs' marketing scheme by purchasing cheaply a foreign book that is essentially the same as its domestic counterpart. So, Plaintiffs chose in this case to address their serious business problem - the severely deleterious impact on U.S. sales of foreign editions of virtually identical textbooks produced for foreign distribution - by characterizing the insured's behavior (including the advertising) as infringements under U.S. copyright law.

This approach is based upon the Plaintiffs' broad reading of the copyright law, but more importantly, upon recent U.S. Supreme Court authority. Plainly, the Plaintiffs believe that the advertising and sale of foreign editions infringes their rights. The Plaintiffs' First Claim For Relief (Complaint pars. 23 - 32 and Amended Complaint pars. 22 - 31) alleges infringement pursuant to 17 U.S.C. 501, which is the primary section of the U.S. Copyright Act that defines "infringement." In turn, this section refers to 17 U.S.C. 106, which describes in broad terms what rights a copyright holder has (or in other words, what it means - legally speaking - to have a "copyright"). Section 106, in turn, implicates 17 U.S.C. 602 which deals expressly with imported goods.

For members of the bar involved in copyright litigation, a Complaint that invokes Section 501 in the context of imported copyrighted goods connotes and denotes any number of direct and indirect claims concerning the copyright owner's vaguely circumscribed "distribution" rights and that certainly would include claims that infringement occurred in advertisements. No further amplification is needed of this allegation in the Complaint beyond claiming a Section 501 violation to invoke a multitude of claims and remedies sought. Therefore, Hartford cannot ignore the broad nature of these claims or the simple pleading requirements necessary to state a copyright infringement claim and offhandedly determine the Complaint and the facts of this action did not create a duty to defend on its part. The claims made and the insured's activities do not justify such a conclusion.

In 2005, the Supreme Court in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 125 S.Ct. 2764, 162 L.Ed.2d 781, considered sections 501 and 106,[1] and others,

---

[1] The Supreme Court's opinion makes no mention of any section of the U.S. Copyright Act. It refers only to the Copyright Act as a whole, at "17 U.S.C.

elaborated on their current and historical meanings, and ultimately concluded that "[e]vidence of 'active steps ... taken to encourage direct infringement,' [citation omitted], such as advertising an infringing use . . . show an affirmative intent . . . to infringe, and a showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use. . . ." Emphasis added. Also, the Court stated that "a copyright . . . defendant who not only expected but invoked infringing use by advertisement was liable for infringement on principles recognized in every part of law." Emphasis added.

These very clearly stated sentiments - which, according to the Court, are well established" - express a similarly clear rule of law that governs every aspect of this case dealing with the insured's liability: encouraging the sale, by way of advertisement, of a product whose very sale infringes a copyright is itself also an infringement of the copyright. And therefore, as stated in *Grokster*, section 501 - which is the very (and only) statute that the Plaintiffs expressly allege as being the basis of the insured's copyright liability (see Complaint par. 29 and Amended Complaint par. 28, and par. B of the demand clause in each Complaint at page 10)- embraces this principle to the same extent as other forms of infringement. Thus, section 501 contemplates lots of differing types of behavior that would be deemed an infringement, most assuredly and prominently, the advertisement for sale of works whose very sale might be an infringement.

Based upon the foregoing as well as our February 7, 2008 letter, it is therefore evident that there is both a factual and a legal basis that your insured's behavior constituted "personal and advertising injury" as defined in the policy. Thus, The Hartford owed a clear duty to defend its insured in this matter and should promptly reimburse the insured for all of the defense costs incurred to defend itself in this action.

---

§ 101 *et seq.*" However, the case is obviously a "501" case because almost every copyright case is a 501 case, because the Complaint in that case so alleges, because the briefs to the Supreme Court describe it that way and because the lower court opinions say so as well [*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 380 F.3d 1154 (9th Cir. 2004) and *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 259 F.Supp.2d 1029 (C.D. Cal. 2003)].

As well, 17 U.S.C. 501 expressly refers to 17 U.S.C. 106, which defines the rights of copyright.

Aside from the duty to defend, there is also a duty to indemnify your insured in this matter because acts of copyright infringement occurred in the insured's advertisements, because the advertisements encouraged an infringing use of the textbooks, and because the damages and settlement was computed based upon the number of different textbooks the insured *offered for sale* during the policy period.

It bears repeating that *Grokster* stands for the legal principle that advertising itself is an offense contemplated by 17 U.S.C. 501. *Grokster* is recent and unequivocal - it was decided unanimously - support for the notion that the fact of advertising is itself an act of infringement, at least where as here, the advertising induces or encourages a direct infringement of a copyright. As previously mentioned, the only way in which TBG induced sales (and induced sales of books that the Plaintiffs believe are illegal) was to advertise that it had books to sell. Thus, for the insured, the advertising activity and the sale activity for any given book were inextricable.

It may be helpful to note that the insured's advertising is not merely incidental or occasional marketing or other promotional activity; it is its lifeblood. All of its sales come from the Internet, and a very large share of its total sales came from its postings on websites maintained by other online sellers and marketplaces, which maintain seller ratings (dealing with reliability, timeliness, etc.). These ratings are publicly available, and often are one of the few measures any potential buyer has of evaluating the integrity of any seller. Thus, the insured's postings on these websites not only lead directly to sales - no buyer would buy a book from the insured unless the insured had advertised it, because no seller would otherwise know that the insured was selling the book, and no buyer would know how to contact the insured to buy such a book - but to a reputation as well, which in turn leads to more sales.

TBG unwittingly engaged in allegedly infringing use of the copyrights by promoting the sale of foreign editions through advertising. Violations of the copyright laws trigger damages pursuant to 17 U.S.C. 504, which provides essentially for three basic measures thereof: (a) a plaintiff's lost profits, (b) a defendant's net but ill-gotten profits and (c) "statutory damages" pursuant to 17 U.S.C. 504(c). A plaintiff may also recover attorneys' fees and other costs of litigation. In this case, during settlement negotiations, the insured successfully negotiated its damages limited only to statutory damages

computed at a per book amount at the very low end of the statutory scale.

Statutory damages are not punitive damages. Instead, they are awardable in lieu of actual damages and are available only at a plaintiff's election. A defendant cannot challenge the election, and a court may not reject it (although a court does have discretion regarding the actual statutory damages awarded). Statutory copyright damages are awarded "to avoid the strictness of construction incident to a law imposing penalties, and to give the owner of a copyright some recompense for injury done him, in a case where the rules of law render difficult or impossible proof of damages or discovery of profits." *Douglas v. Cunningham*, 294 U.S. 207; 55 S. Ct. 365; 79 L. Ed. 862 (1935) (interpreting statutory damage section of the predecessor copyright statute). The then Registrar of Copyrights opined during debates leading to the passage of the current Copyright Act that statutory damages are awarded only if: (1) the value of a copyright and its infringement are too hard to determine, and thus actual damages would be conjectural and ineffective; (2) actual damages are often less than the costs of prosecuting the case; and (3) defendant's profits may be small and thus constitute an inadequate award. Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 102-103 (House Comm. Print 1961).

The statutory scale runs from $750 to $30,000 per work infringed, no matter how many times a given work is infringed. Upon application, a court may reduce the lower threshold to as low as $250 per work for so-called "innocent" infringers and may raise the higher threshold to as high as $150,000 per work for willful and malicious infringers.

The Final Order in the insured's case lists 326 separate book titles that the Plaintiffs claim were advertised or sold or both by TBG during August, September and October 2007. These months are within Policy Period. The court accepted these titles and selling period as a legitimate factual basis for the injunction and damage payment directives in the Final Order.

According to the Complaint and the Amended Complaint, at least 180 of these titles were listed on one website alone, eBay. As mentioned above, every book that the insured wanted to sell was listed on one website or another, and those books listed on websites other than its own were accompanied by book details, seller comments and pictures of the book cover, all of

which clearly constitute "advertising."[2] So, based on this allegation alone, over half of the infringing titles listed in the Final Order were listed on just one website, which means that at least this many were "advertised" during the policy period.

The Plaintiffs settled on this period during settlement negotiations mostly because their own investigation showed allegedly infringing advertising and sales during the first two of these months and because the insured's business records for all three months were the most readily available and comprehensive. As a practical matter, the insured stopped selling foreign editions altogether in mid-September 2007, almost immediately after Plaintiffs served him with the Complaint (on September 17, 2007).

The Final Order requires the insured to pay amounts totaling $76,000 as damages for the advertising and sale of textbooks in violation of Plaintiffs' copyrights. This amount was computed somewhat arbitrarily, but nonetheless in recognition of the obvious fact that the insured's culpability in the matter was "innocent" infringement and not malicious and willful and that the insured had both legal and factual defense to the claims made.

The actual damage award per work was $233.13, less than the absolute $250 statutory minimum for genuinely innocent infringers. Had the matter proceeded to trial or other more elaborate disposition, the insured almost certainly would have faced both a higher per work award and a finding of more works allegedly infringed. By comparison, the basic statutory damage minimum, $750, times the number of works listed in the Final Order, 326, yields a low end damage award of - and concomitant insurance claim - nearly a quarter million dollars. Overall, the insured resolved the matter quite to its and Hartford's favor, considering the law, the odds and the stakes, as well as Plaintiffs' imposing resources and Hartford's lack of participation in the defense.

We believe that there is a strong argument that the policy entitles the insured to full indemnification for the $76,000 that the insured has been ordered to pay. This is because the advertising and the sale of the books in question are inextricably linked, all arguably infringing activities relating

---

[2] Well over half of TBG's total sales came from sales of books posted on websites other than its own.

to the books listed in the Final Order occurred during the policy period and the infringements occurred by way of advertising that utilized copyrighted material (e.g. the book covers and titles).

Since each sale necessarily required accompanying and assertedly infringing advertisements, there is no way to separate the damages owed for a sale from damages owed for advertising. Indeed, the law itself makes no distinction between damages for direct violations (viz., sales) and indirect violations (viz., advertising) of the Copyright Act.

This being so, The Hartford would be held to bear the whole loss if one cause is covered and the loss is incapable of apportionment, especially where it chose not to participate, wrongfully so, in the defense of this action. However, the insured would like to resolve the matter promptly. Thus, on its behalf, we demand that The Hartford pay three-quarters of the $76,000 court-ordered damages, or $57,000, together with payment of the insured's legal fees and disbursements.

I look forward to your early response in this matter.

Very truly yours,
*Richard A. Galbo*
Richard A. Galbo

RAG/wjh
Enc.

cc: Matthew Stirling
Christ Gaetanos, Esq.